William A. Zahn *v.* Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company, Appellant.

*Railroads—Appropriation of land—Location—Viewers.*

Railroad companies, under their right of eminent domain, survey and appropriate land for the lines of their road, within the limits fixed by the statute, and point out the boundaries to the viewers appointed to assess the damages for the land taken according to the boundaries thus fixed by the company. It is no part of the duties of the viewers to fix the lines or determine the quantity of land to be taken.

*Railroads—Condemnation proceedings—Map made by viewer—Location.*

In railroad condemnation proceedings a map was made by a viewer and filed of record. The company claimed a right of way sixty feet wide; the land owner claimed that a less amount had been appropriated. On the

trial of an action of ejectment brought by him for the strip of land in dispute he introduced in evidence the map filed in the condemnation proceedings, which did not show a single course or distance, or the width of the land for which damages were awarded. The expert evidence introduced by both parties was conflicting as to whether the map established the boundaries of the right of way. *Held,* that the map was too indefinite to establish the boundaries of the right of way.

*Railroads—Appropriation of land—Adverse possession—Statute of limitation—Ejectment.*

Where there are no monuments upon the ground to indicate the boundaries of a railroad company's right of way, and there is no survey on record or elsewhere to define such boundaries, the extent of the actual occupancy must determine the limits of the right of way.

Where a railroad company has lawfully entered upon land for its right of way, and has made compensation to the owner therefor, and for twenty-one years has had an actual and exclusive occupancy of a strip sixty feet wide, the boundary of the easement is forever settled by such occupancy, and the land owner cannot recover any portion of such strip on the ground that the railroad company originally appropriated and paid for a less quantity of land.

Argued Oct. 27, 1897. Appeal, No. 98, Oct. T., 1897, by defendant, from judgment of C. P. No. 1, Allegheny Co., September T., 1895, No. 872, on verdict for plaintiff. Before Sterrett, C. J., Green, Williams, McCollum, Mitchell, Dean and Fell, JJ. Reversed.

Ejectment for a strip of land in the borough of Ingram. Before Stowe, P. J.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

[This case came into the district court, the court having at that time jurisdiction in all civil suits over $100. That was changed by the constitution of 1874, making two common pleas courts at that time. When they got into court, these parties, for some cause or another, got together. The report of the viewers, it is claimed, did not define exactly where the right of way was, it was simply a right of way through the property of the owner ; and when the viewers made their report they did not do as they ought to have done, and as is customarily done now, have a plot attached exactly defining the right of way, giving courses and distances, and having marked upon it in such a

way that you could exactly tell how much was taken, how much was taken for the 60 feet, as was allowed under the act of assembly under which this proceeding was had, and how much would be taken for banks and slopes. The general railroad law says 50 feet, and I suppose this act was 60 feet. The parties were limited to 60 feet, except in the case of embankments and slopes. When that report was made, they had the right to take 60 feet to use for ordinary railroad purposes, for tracks and sidings and switches, and also what was necessary for embankments and slopes to support the bed of the road, which must be almost upon a level. They had to pay for the land taken for embankments as far as it was necessary to slope it up in order to give it such a grade as it would not fall down upon the road, and also for the body of the road, 60 feet. When they got into court, these people having come to some conclusion as to the controversy, one of the viewers, Mr. Patterson, an old, well known surveyor at that time, made a plot, and they compromised, it seems, whatever the dispute was, upon the assumption that that was to contain what the railroad company was to have. Damages had been assessed, and the owners of the property did not seem satisfied. They got together, and they said, in substance, " we will give you so much ground, defined in this plot, for the damages." The company said, " we will take that land now, and pay you what the viewers agree to, and that will end it." And so it did for the time being, but now the question is, what was the actual amount of land comprehended in that arrangement? In other words, what does that plan cover?] [1]

[Well, upon its face it is vague; it is not certain, and yet possibly it might be made sufficiently certain for the jury, with the assistance of outside testimony, to define where the exact location of the line was at the time, because whatever was agreed upon then, as defined by this paper, you are bound to interpret under the testimony, and upon the assumption that the paper itself is the limit of the right, not only of the railroad company, but the limit of the right of the plaintiff in this case to claim and, of course, the limit of the original owner.] [2]

Plaintiff's third point and the answer thereto were as follows :

. 3. The defendant company and its predecessors, being railroad companies, invested with the right to take private property, must make just compensation to a land owner whose

property they enter upon and seek to appropriate, and until such compensation is either paid or secured, they acquire no title ; and any entry of the defendant company or its predecessors upon the land of the plaintiff, no matter how long ago, and any possession of the defendant and its predecessors of said land, no matter how long it has continued, would not give the defendant title to any portion of such land, unless the same was legally appropriated and the landowner's damages paid or secured. *Answer :* Affirmed. This is the matter which was suggested yesterday afternoon, and in which I took issue with the plaintiff's counsel, at that time being convinced that the statute of limitations did run. And I am not satisfied yet that there is any specific authority in the state conclusive upon that subject. But the very case that I had inferred decided that the statute did run, upon a more careful examination I find did not decide any such question. The logic and the inference and the necessary result of Justice AGNEW's opinion in that case does establish the principle that in cases of corporations (railroad corporations particularly) they cannot get any right by an adverse possession of twenty-one years ; that the only way they can get the right is by the right of entry. Under the act of assembly they are bound to give security and proceed in that way, and the mere taking possession, although the property holder may say nothing about it, and the railroad company may use it for twenty-one years, does not prevent the property owner from subsequently either proceeding for damages or in an action of ejectment. Therefore I say that the statute of limitations does not give the railroad company a right to hold this property, even if there had been any actual adverse possession for twenty-one years. I do not know that the evidence shows that, but I put it this way for an ulterior purpose. [3]

Defendant's points and the answers thereto among others were as follows :

2. It appears from the evidence in this case that the Pittsburg & Steubenville Railroad Company, by proper legal proceedings, in the district court of Allegheny county, appropriated and paid for a right of way through this property; that as said Pittsburg & Steubenville Railroad Company was authorized by its charter to appropriate a strip of ground 60 feet in width, and there is nothing either in the petition for the appointment of

viewers or the report of the viewers to indicate that any less amount of ground was taken by the railroad, the jury should find in favor of the defendants for all ground within 30 feet of the original center line of the Pittsburg and Steubenville Railroad. *Answer:* Refused. The presumption is that the defendant's right of way was 60 feet wide, but it is for the jury to say whether or not, under the evidence, the railroad company actually acquired that extent or less, under the plat accompanying the proceedings in the district court, and the evidence of witnesses tending to throw light upon that question. [4]

3. The plot or draft filed in the case at No. 223, November term, 1853, and referred to in the release filed by Flanigan, and the order of court overruling the exceptions to the viewers, is so vague and indefinite that it cannot have the legal effect of limiting or defining the extent of the appropriation. *Answer:* Refused. While it certainly is in itself " vague and indefinite," and without extrinsic evidence would not sufficiently define the rights of either party, it is for the jury, under the evidence tending to explain the actual extent and meaning, to determine what is its actual extent and meaning, and not for the court. [5]

4. If the jury believe from the evidence that at the time the plot was filed in the case at No. 223, November term, 1853, the railroad had not been constructed upon the ground, and that said plot does not show the amount of ground actually taken or occupied in the original construction of the road, and that for many years, without objection, the railroad company occupied the ground described in the writ, with its tracks, embankments, telegraph poles, etc., without any objection on the part of those under whom the plaintiff claims title; that when James McCabe, who was the owner of this portion of the Flanigan farm in 1868, laid out a plan of lots, he showed or indicated a right of way for the railroad 60 feet or upwards in width, and when he conveyed the property he conveyed it by deeds referring to said plan, and that when the Graces, who owned the property in 1890, conveyed to Hackmeister, and when Hackmeister conveyed to Zahn, the plaintiff, in 1891, they made deeds calling for the north line of the right of way of the railroad, and fixed that line at a point 30 feet or more from the center line of the railroad, such facts are strong and persuasive

evidence, and would justify the jury in finding, in connection with the presumption of the appropriation of a strip of ground 60 feet in width, that the company had appropriated, and is entitled to the possession of, a strip of ground at least 60 feet wide through this portion of the Flanigan farm. *Answer :* This point is affirmed, except so much as says "it would justify the jury in finding." It certainly is strong and persuasive evidence, but whether, taken in connection with the other evidence in the case, it will "justify" the jury in finding as suggested, is a matter for the jury alone to determine. [6]

5. That if the jury believe from the evidence that for more than twenty-one years prior to August 28, 1895, the date of the bringing of this suit, the railroad company occupied the land described in the writ openly, notoriously, continuously and ad versely to the title of the plaintiff and those under whom he claims, and under a claim of right, to wit: a claim of title acquired by the appropriation proceedings offered in evidence in this case, it is too late for the plaintiff to set up title against the railroad company, and the verdict should be in favor of the defendant. *Answer :* Refused. The statute of limitations limiting plaintiff's right to bring this action within twenty-one years, does not apply to such a case as this. [7]

Verdict and judgment for plaintiff. Defendant appealed.

*Errors assigned* were (1–7) above instructions, quoting them ; (8) admission in evidence of the Patterson plan referred to in the opinion of the Supreme Court.

*George B. Gordon,* with him *William Scott,* for appellant.— There is no designation, either in the petition for the appointment of viewers or in the report of the viewers, as to the width of the ground appropriated by the company, nor any description whatsoever of the same. It follows, therefore, that the company took a right of way of the width designated by its charter, that is, sixty feet, extending thirty feet on each side of the center line : Jones v. Erie & Wyoming Val. R. R., 144 Pa. 639 ; Phila. & Reading R. R. v. Obert, 109 Pa. 193.

It is submitted that the Patterson plot was technically no part of the record. Its tendency was to confuse the jury, and it ought not to have been admitted in evidence.

It was the duty of the court with reference to this record, and the plan, if it were a part of the record, as a matter of law, to give the jury instructions as to its force and effect. The only instructions given were misleading, and they were, as a whole, entirely inadequate.

After twenty-one years adverse possession, the right of the defendant to continue that occupation is impregnable, whether it be a company invested with the power of eminent domain, or whether it be a private individual : Act of March 26, 1785, Purdon 1209, pl. 3; Sherlock v. Louisville, etc., Ry., 115 Ind. 22; Organ v. Memphis, etc., R. R., 51 Ark. 235; American Bank Note Co. v. N. Y. Elevated R. Co., 129 N. Y. 252; Florida Southern Ry. v. Loring, 2 U. S. App. 310 ; Railroad v. O'Hara, 48 Ohio, 343; Railroad v. Hambleton, 40 Ohio, 496 ; Emery v. Raleigh, etc., R. R., 102 No. Car. 209; Cogsbill v. Mobile, etc., R. R. Co., 92 Ala. 252; Turner v. U. P. Ry., 112 Mo. 542; Hargis v. Kansas City, etc., Ry., 100 Mo. 210; St. Louis, etc., R. R. v. Nugent, 152 Ill. 119; Peoria, etc., Ry. v. Tamplin, 156 Ill. 285; Myers v. McGavock, 39 Neb. 843; City of St. Paul v. Chicago, etc., Ry., 63 Minn. 330; Marchand v. Maple Grove, 48 Minn. 271; Lehigh Valley R. R. v. McFarlan, 43 N. J. Law, 605; Pa. R. R. v. Thompson, 45 N. J. Eq. 870; Blaisdell v. Portsmouth, etc., R. R., 51 N. H. 483; Cass v. Penna. Co., 159 Pa. 273.

At all events there has been a conclusive determination of the extent of the appropriation by the continuous and contemporary acts and declarations of both parties, and the occupation of the ground.

*Charles M. Thorp*, with him *A. Leo Weil*, for appellee.—The limits of the right of way appropriated by the railroad company must be determined by the appropriation proceeding and the plot filed therewith : Jones v. Erie & Wyoming R. R., 151 Pa. 30; Phila. & Read. R. R. v. Obert, 109 Pa. 203.

A railroad company cannot acquire title to real estate without first paying therefor or giving security for such payment: McClinton v. Ry., 66 Pa. 404; Wheeling, etc., Ry. v. Cleland, 37 Leg. Int. 466; Phila., etc., R. R. v. Cooper, 105 Pa. 239; Wheeling, etc., R. R. Co. v. Warrell, 122 Pa. 613; Oliver v. Ry., 131 Pa. 408; Richards v. R. R., 137 Pa. 524.

The case of Grugan v. Philadelphia, 158 Pa. 337, has been cited as deciding that the statute of limitations is a bar in favor of a municipal corporation taking property without paying for it. But that case contains merely a dictum touching the point referred to, and the point itself was not decided.

OPINION BY MR. JUSTICE DEAN, January 3, 1898:

This suit is an ejectment for a strip of land along the line of defendant's railroad in what is now the borough of Ingram, Allegheny county; the land claimed by plaintiff being 185 feet long and 37 feet wide, measuring from the center of the railroad bed. It is now occupied by defendant with its tracks, and a siding at the station. In 1853, the land was part of a tract of one hundred acres owned by James Flanigan, in what was then Chartiers township, Allegheny county. The plaintiff shows title by successive conveyances from Flanigan, so far as Flanigan had title to the disputed piece. The defendant claims that the land was appropriated in 1853 for railroad purposes under right of eminent domain by its predecessor in franchise, the Pittsburg & Steubenville Railroad Company, and since that time has been occupied for railroad purposes. It appears from the record that, on August 27, 1853, Flanigan, the then owner of the one hundred acres, presented his petition to the then district court of Allegheny county, setting forth, as owner, that the railroad company, under the act of 1849, had entered upon his land and appropriated a part of it for a railroad, without his consent; that they had not been able to agree upon compensation for the damages, and therefore he asked that seven viewers be appointed to assess his damages. The court appointed the viewers, who went on the premises, had several meetings, at which they heard testimony, and made report to the court, November 5, 1853, that the railroad company had taken and occupied of Flanigan's land three acres and one hundred and two perches; that this was tillable and pasture land, but there was also included in this part of a slaughter house yard, garden and orchard, and that further, a valuable spring had been destroyed. They therefore assessed his damages at $2,900. The court confirmed the report nisi. The railroad company then filed exceptions which in the main complain that the damages allowed were grossly excessive, the testimony showing that the land was

worth only $200 per acre, at the very highest, while the sum allowed shówed it had been valued by the viewers at more than $900. At the argument of the exceptions Flanigan filed a written stipulation to accept the $2,900 awarded by the viewers in full for the three acres, one hundred and two perches of land taken, as shown by a plot made by N. Patterson, ·one of the viewers, and filed; and further, he agreed to discharge the railroad company from all damages·by reason of its filling up and covering land adjoining the railroad to the extent of two acres, one hundred and eighty-one perches. The court thereupon overruled the exceptions and confirmed absolutely the report of the viewers, embodying however in and making the written stipulation of Flanigan part of its decree. This however was of the court's own motion, the railroad company not consenting thereto. · Judgment was entered against the company for the $2,900, from which the company took a writ of certiorari to the Supreme Court, and the judgment was affirmed per curiam. No question touching the present contention was raised on the certiorari.

The source of the dispute now arises from the map filed by N. Patterson, one of the viewers. If no map had been filed the ·conclusive presumption would have been, after this lapse of time, that whatever portion of land the company had entered upon and occupied in 1854, within the limit of its right to appropriate under the act of 1849, was the land embraced in the viewer's report and the court's decree, in the statutory proceeding for damages. Under that act it had a right to appropriate not to exceed 60 feet in width, except where it might take more at deep cuttings, high embankments or places selected for sidings, turnouts, depots, engine or water stations. At that early day in railroad building, when land was far less valuable than now, but little care was taken by either owners or railroad corporations in defining with accuracy the limits of the appropriation. The damage resulted in most cases, not so much from the quantity of land taken as from a steam railroad being run and operated through a cultivated farm. The five or ten acres appropriated out of a one hundred acre farm was but a small part of the damage sustained, and could be easily computed; the expense and interruption in the pursuit of his peaceful avocation by the·new method of carrying, was the most grievous

complaint of the farmer. By the act referred to, the corpora-
tion had power to survey, ascertain, locate, fix, mark, and deter-
mine the quantity appropriated; but this was seldom done;
while it is almost the invariable, and undoubtedly the far better
practice in later years, for the company engineers to map and
file of record, as part of the proceedings, a plot of the land taken.
In such case as the last, no question like unto the one before us
could arise; the company would be estopped by its own defini-
tion, from enlargement of the original appropriation. The land
owner could not encroach on the easement for which by the
judicial record he had been compensated. Here, if the company
by survey did fix, mark and determine the area of land within
the statutory limit of its right, no survey or plot of it was filed
in the proceedings. The quantity of land which the company
is allowed to appropriate is not determined by the viewers; it
is no part of their duty to fix the lines of the appropriation.
The company under its right of eminent domain surveys and
appropriates the land within the limits fixed by the statute, and
points out the boundaries. The viewers assess the damages
for the land taken, according to the boundaries thus fixed by
the company. In the case before us, one of the viewers filed a
map made by himself. There is no evidence that the company
had any hand in making this map, or that it was made from
stakes or lines pointed out by those representing the company.
On the trial of the case, in the opinion of the learned judge of
the court below, the issue turned on the question, solely, of
what land was included in the boundaries of the Patterson map.
On that theory the evidence was submitted to the jury, who
found for plaintiff, and we have this appeal by defendant, as-
signing eight errors. In the view we take of the law, all of
them may be discussed under two heads: 1. What effect should
be given to the map filed? 2. What effect, under the evidence,
should be given the plea of the statute of limitations?

The map does not indicate, with even approximate certainty,
the extent of the original appropriation. There is not a single
course, distance or width given of the land for which damages
are awarded. It shows the courses and distances of the outside
lines of the Flanigan farm, then, a narrow strip in white, diago-
nally for 2,459 feet across it; then, along this strip, irregular
patches colored in pink and blue, without a measurement to one

of them. Flanigan presented his petition for the appointment
of viewers after the company had entered under the statute which
gave it a right to appropriate sixty feet in width; he did not
specify in his petition what quantity the company had taken; the
viewers went upon the land, and after observation and testi-
mony, reported the quantity at three acres, one hundred and two
perches. This would make a strip sixty feet wide the whole
length of the road through the farm. The plaintiff's theory was
that the Patterson map limited defendant to a width at grade of
ten feet, or five feet on each side of the center line of its road.
There were expert witnesses, engineers, called on each side, whose
testimony on the one hand tended to show that the map estab-
lished the theory of plaintiff as to the extent of appropriation;
on the other hand, that of defendant; but the very fact that their
testimony was in conflict showed the impossibility of defining
with certainty the boundaries by this map. As we understand
it, the purpose of a map of this character is to show clearly
the particular land taken; if it be capable of flatly contradic-
tory interpretations, then of itself it creates uncertainty. The
opinion of the learned judge of the court below who heard the
evidence on this point may be gathered from this excerpt from
his charge; " The presumption, apart from any evidence, is that
the railroad company took sixty feet, and it devolves, in that
view of the case, upon the plaintiff to show that which would in-
dicate that the railroad company did not take that much. They
claim that is done by the plot filed in the proceedings in the
district court. That is a matter for you. Witnesses have been
called. Some of them say this plot is so vague and indetermi-
nate that you cannot tell any thing about it. If you find that
to be true, the presumption of the law prevails that the railroad
company has sixty feet, the burden devolving on the plaintiff
to show that the company took less than they were entitled to
under the law." In this view of the case, the extent of defend-
ant's appropriation was determined by a map, from its face un-
certain, and not made certain by petition for viewers, decree of
the court, by expert inspection, measurements or computation.
Although filed of record, the map was valuable as a record of
the rights of neither party; there is in fact no designation of
record showing the boundaries of the original appropriation; it
shows but one thing with verity, viz, the general course or route

of the road through the Flanigan farm. This being the case, how shall the boundaries or extent of the appropriation be established? We think actual occupation of the land in the exercise of the right of domain. What was the extent of its occupation? The decree of the court states that Flanigan, in consideration of the damages, had agreed to release three acres and one hundred and two perches, as shown by the report of the viewers and the diagram, and further, all claims on account of filling up and covering two acres and one hundred and eighty-one perches adjoining the railroad. On the same day, Flanigan filed his release, in which are these words: "The said ground so taken and occupied embraces and includes a double track or switch throughout a great portion of its length, or the whole thereof." It is undisputed that at the date of the view the railroad company had begun work, and that it prosecuted it continuously for six or seven years, when it commenced running its cars by a single track on a roadbed, graded much wider than necessary for the one track. A line of telegraph was put up on the side now owned by plaintiff, thirty feet from the center of the track, and the poles remain as they were originally planted. James McCabe, holding under Flanigan, and predecessor in title of the land claimed by plaintiff, laid out part of his land in lots, and in 1868 recorded a plot of the lots; on this plot he excludes from his lots the roadbed, sixty feet wide. In 1871 and 1872 the company put down another track within the sixty feet, also a siding, making three tracks. Hackmeister, the immediate grantor of this plaintiff, fixed his eastern boundary by the west side of the railroad company's right of way. There is no assertion of a boundary which encroaches on defendant's occupancy. Therefore, the undisputed facts show that, whether the appropriation was marked upon the ground prior to the view, there was an actual claim to an appropriation, then, of over five acres, which Flanigan, by his release, conceded; that, in 1866 the telegraph line was put up thirty feet from the center, and in 1872 practically three tracks were laid. The evidence shows then without dispute an actual occupancy by defendant for a longer period than twenty-one years before suit brought of a strip of land through the Flanigan farm, at least sixty feet wide. While the verdict in the case appears to us vague, it is certain enough if the judgment stands to indicate

to the sheriff, on a writ of hab. fa., that he must deliver posses-
sion to plaintiff of very nearly one half the land which defend-
ant has occupied for more than the statutory period.   We think
there was error in permitting the jury to so find from this evi-
dence.   The learned judge of the court below thought that
"the logic and the inference and the necessary result" of the
opinion of this Court in McClinton v. Railway Co., 66 Pa. 404,
is that railroad corporations can acquire no right by an adverse
possession of twenty-one years.   While not questioning the
correctness of this conclusion when drawn from all that was
said in that case, nevertheless, as a precedent, we adopt the rea-
soning of it only so far as it vindicates the point decided; and
that was in the language of AGNEW, J., who rendered the opin-
ion: "Can a railroad company, without a grant, release or legal
appropriation, enter upon any man's land nolens volens, and
then bar his re-entry by an adverse possession of six years?"
The answer was, it could not; and following what was said to
its logical conclusion, the same answer would, perhaps, though
not necessarily, be given where the corporation set up a defense
of twenty-one years' adverse possession.   In several cases since,
notably that of Keller v. R. R. Co., 151 Pa. 67, opinion by the
present Chief Justice, the cases among them, McClinton v. Ry.
Co., are very fully considered, and it is held that the general
limitation act of 1713 applies only to common-law actions; and
further, that a statutory limitation of six years to actions for
damages against railroads was in violation of section 21, arti-
cle 3, of the constitution.   Therefore, the law as to the six
years' statute of limitation in a proceeding for damages against
a railroad company, may be considered as settled.   We are not
inclined to at present make further inquiry, because it is wholly
unnecessary here.   Without dissenting from the conclusion as
to where the logic of McClintock v. R. R. Co., would lead, we
are very sure that neither the facts nor the logic of that case
fit the one before us.   This is an ejectment, a common law
action; the entry was by grant, release and appropriation, all
three; the defendant was not an intruder without right when
it entered on Flanigan's land in 1853.   It entered under the
authority conferred by the commonwealth for a public purpose;
it did appropriate, did compensate, under all the forms of a well
defined statutory proceeding.   Besides, the owner executed a

formal release. It was in no sense of the word an intruder on
Flanigan's farm, but entered by authority of law, with the right
to appropriate a strip the length of its road through the farm,
not exceeding sixty feet, unless certain specified purposes re-
quired more. Its mere entry and occupancy of the land for
twenty-one years did not invest it with title to an easement.
That it possessed beyond controversy by its lawful entry and
compensation, made at the foot of a judgment under the statute,
to the owner, but as no monuments on the ground erected at
the date of the entry have survived to now indicate the extent
of the original taking, and no survey on record or elsewhere
serves to define the boundaries, they must be determined by the
extent of the actual occupancy. And while we do not decide
that a trespass by a railroad corporation for twenty-one years
would bar the owner from re-entry, yet we do decide that a
lawful entry, appropriation and exclusive occupancy for the
period of twenty-one years, of land not exceeding the width of
the lawful limit, settled forever the boundary of the easement.
A natural person can, by a trespass, accompanied by open, noto-
rious, exclusive, adverse possession for twenty-one years, bar
the owner; still he must define his boundaries and show an
actual occupancy up to them. An artificial person, the creature
of statute, it is argued, can acquire no right or title to an ease-
ment except by entry in the mode authorized by statute. Con-
cede this, yet when it has entered lawfully, it can define the
extent of a lawful appropriation by marks on the ground, by
maps of surveys filed of record, or by actual occupation for
twenty-one years.

We are of the opinion: 1. that the Patterson map is so indefi-
nite that the boundary of the original appropriation is no more
certain with than without it; 2. that the actual occupation of the
land by defendant for a period of more than twenty-one years,
to the extent of that occupation, fixes with certainty its right;
3. that plaintiff can recover no land within the boundaries so
occupied.

The claim of plaintiff being for land within the lines of de-
fendant's actual occupancy, it follows that he cannot recover,
and the court should have so instructed the jury.

What we have said in effect disposes of all the assignments
of error.

The judgment is reversed.