### CENTRAL R. CO. OF NEW JERSEY v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit.   December 29, 1915.)

#### No. 1963.

1. CARRIERS ⬦⟹38—INTERSTATE COMMERCE ACT—REBATES—PROVISIONS OF LEASE.

A coal mining company, owning a railroad with branches to its mines in the Lehigh mining district, in 1871 leased the same to defendant for 999 years; defendant agreeing to pay as rental a stated sum annually, and also to give to the mining company certain advantages in rates over other shippers in the same region by charging it only the rates in force from a designated point. After the enactment of the Hepburn Amendment (Act June 29, 1906, c. 3591, 34 Stat. 584) to the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379), defendant attached a note to its tariff schedules filed, setting out the requirements of its lease, and thereafter, while charging the mining company schedule rates from points of shipment, as it did other shippers, it returned a portion of such charges in monthly settlements. *Held*, that such allowance was not for the use of an instrumentality of commerce furnished by the mining company, since by the lease defendant became for all practical purposes the owner of the road, and that on the enactment of the Interstate Commerce Act, and especially section 6, as amended by Hepburn Act June 29, 1906, § 2 (Comp. St. 1913, § 8597), the allowance became illegal as a rebate; its effect being to give the mining company an advantage over other and competing shippers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. ⬦⟹38.]

2. CARRIERS ⬦⟹38—INTERSTATE COMMERCE ACT—PROSECUTION FOR VIOLATION —DEFENSES.

That defendant made such payments in good faith and in the belief that they were not prohibited by the act is not a defense to a prosecution for its violation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. ⬦⟹38.]

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Criminal prosecution by the United States against the Central Railroad Company of New Jersey. Judgment of conviction, and defendant brings error. Affirmed.

Charles E. Miller and Jackson E. Reynolds, both of New York City, for plaintiff in error.

Henry S. Mitchell and Alexander H. Elder, both of Washington, D. C., for the United States.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. In the court below the Central Railroad Company of New Jersey was convicted and fined for violating the so-called Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [Comp. St. 1913, §§ 8597–8599]), as amended by the Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 584). The offense was carrying anthracite coal for the Lehigh Coal & Navigation Company at less than the published tariff rate. The indictment was found in November, 1914, and contained 200 counts, covering the unlawful carriage of 200 separate carloads during the period from December, 1911, to June, 1914. The defendant was found guilty on 185 counts, and on 25 of these the court imposed fines aggregating a large sum. The amount of the fine is not in controversy, but an attack is made upon the correctness of certain rulings and instructions during the course of the trial.

In a few words, each count charges the offense substantially as follows: The defendant, an interstate common carrier, transports anthracite coal for hire; the coal moving in carload lots. Being subject to the acts regulating commerce, it filed printed tariffs and schedules with the Commission, showing its rates and charges for carrying coal from Nesquehoning, in Carbon county, Pa., to points in other states. While these tariffs were in force, the carload described in the count was carried for the Navigation Company at the tariff rate; but a specified portion of the rate was afterwards unlawfully and knowingly repaid, so that the coal was really carried at less than the tariff rate, and the Navigation Company received the advantage of an illegal rebate.

Some shipments were carried to points on the defendant's own line, and others were carried to points on the lines of connecting carriers under agreements for through routes and joint rates. By stipulation some of the facts were agreed upon, and there was no real dispute about the others; the controversy being merely over the meaning they should bear. The defendant denied that the payments were rebates, asserting them to be compensation for the use of an instrumentality of transportation furnished by the Navigation Company. In order to present the situation fairly from the defendant's point of view, we follow its statement in the main, and condense the facts therefrom, but we think with sufficient fullness.

Not long after 1860 the defendant, a New Jersey corporation, was

operating a railroad that crossed the state from Elizabethport and Jersey City, on New York Harbor, to Easton, Pa., at the junction of the Delaware and the Lehigh rivers. At Easton it connected with the Lehigh Valley Railroad, a Pennsylvania road running westward up the Lehigh river to the anthracite coal field; and afterward it also connected at the same place with another Pennsylvania road, the Lehigh & Susquehanna Railroad, built and owned by the Navigation Company. The history of the Navigation Company is briefly this: Nearly a century ago, it was incorporated by the state of Pennsylvania to mine coal, and to operate a slackwater navigation on the Lehigh river. It dug a canal along the river from a point south of Wilkes-Barre to the Delaware river at Easton, and carried its coal to Easton by this canal before the railroad was built. The railroad was authorized and laid from time to time, and by the year 1867 or 1868 it was in operation from Wilkes-Barre to Easton, and (as already stated) was called the Lehigh & Susquehanna Railroad. Nesquehoning Junction is a station on this road, a few miles north of Mauch Chunk. A railroad, 18 miles long, ran from the Junction up the valley of the Nesquehoning creek to Tamanend, and in 1868 this was leased to the Navigation Company. Not long afterward another branch line was built that ran in the same general direction into the valley of the Panther creek, which lies south of the Nesquehoning. On this branch is a point called Hauto, and between Hauto and the valley of the Panther creek the branch passed through the Nesquehoning tunnel, which penetrates the mountain separating the two valleys.

The mines of the Navigation Company are in the Lehigh region; nine of its ten collieries being in the Panther creek valley, and the tenth being at Nesquehoning (not the Junction), a station about midway between Mauch Chunk and Hauto. All these collieries were in operation before the Lehigh & Susquehanna Railroad was built, and the coal then mined along the Panther creek was brought to the canal over a gravity road south of Nesquehoning Mountain. The coal from the Nesquehoning colliery at first reached the canal by another gravity road, but, after the Nesquehoning road was built, the coal from that colliery was brought by rail to Mauch Chunk; and, after the tunnel was finished through the Nesquehoning Mountain, the Panther creek coal passed north through the tunnel and also reached Mauch Chunk by way of the Nesquehoning valley road. After the roads referred to had been finished, all the coal carried by them, as well as the coal carried by the Lehigh Valley Railroad, was sold "f. o. b. Mauch Chunk"—that is, the shipper paid the freight from the mine to Mauch Chunk, and the buyer paid the freight from Mauch Chunk to destination. All these railroads were used by other miners and shippers, as well as by the Navigation Company.

Originally the Lehigh Valley Railroad ended at Mauch Chunk, a point on the Lehigh river 46 miles west of Easton. At Mauch Chunk it connected with two short local roads—one running up the river to Penn Haven, and thence westward into the Lehigh coal field; and the other running between Penn Haven and Hazelton, also a point in the Lehigh field. Afterwards these two roads became part of the Lehigh Valley system; but, as they had formerly been separate roads,

the freight rates from the mines to Mauch Chunk continued to be charged in two parts, one from the mine to Penn Haven, and the other from Penn Haven to Mauch Chunk—these rates being called "laterals." Anthracite coal reaches the market in several sizes, but the same rate was charged on each size until late in the '80's. The rate was less, however, if the point of destination was the competitive market at tidewater than if it was an inland or way point. Tide "laterals" and way "laterals" were also charged, the former being less than the latter.

About 1870 or 1871 the coal-carrying roads furnishing traffic to the defendant at Easton had either acquired, or were about to acquire, their own outlets to tidewater, and accordingly the defendant was face to face with the alternative, either of securing a new connection that would furnish it traffic and also an outlet to the west, or of becoming again a local road across the state of New Jersey. The only new connection then available was the Navigation Company's road—the Lehigh & Susquehanna—and accordingly in March, 1871, the defendant leased it for 999 years. The lease included the main line and its branches— among them, the Nesquehoning valley branch—but did not include the tunnel through the Nesquehoning mountain or the road in the valley of Panther creek. The length of the leased line and branches was 150 miles. For many years the defendant's through traffic with the West has moved over the Nesquehoning branch. As rent or compensation for the use of the demised premises, the defendant agreed to pay one-third of the gross receipts from the traffic or business to be derived therefrom, making certain deductions. By the tenth covenant the defendant also agreed (and this is the heart of the case) that on coal delivered for transportation by the Navigation Company—

" * * * on sidings at the northern end of the Nesquehoning tunnel, the rates of transportation shall not exceed the rates charged at the same time from Penn Haven to the same points on coal from the Lehigh region, either by the [Central Railroad] or by the Lehigh Valley Railroad Company."

And on its part the Navigation Company agreed that all its coal should be sent—

" * * * to market over the roads of the parties to this agreement, when destined to points or markets reached by the said roads; and when destined for markets not so reached, it shall be sent as far as practicable over said roads, excepting always coal destined for shipment by canal (and certain other exceptions): Provided, that one-fourth of the coal mined annually by the [Navigation Company] in the Wyoming region may be sent to markets by lines running towards the Delaware river."

A supplemental agreement of May, 1883, provided that the rent, or compensation, or the Navigation Company's share of the gross receipts, under the original lease, should never be less than $1,414,400, and after December 31, 1892, should not be more than $2,043,000; if the maximum should be reached, a further sum should be paid, calculated by a method that need not be described. In 1887, a further amendment was made:

"Whereas, it is important for the interests of both the parties hereto—as tending to secure enough business for the Lehigh & Susquehanna Railroad

and branches to enable the Central Railroad Company of New Jersey to earn sufficient revenues on the Lehigh & Susquehanna Railroad and branches to pay the stipulated rental—that so much as possible of the coal product of the Lehigh Coal & Navigation Company's lands shall be sent to market over the lines of the Lehigh & Susquehanna Railroad and branches, and the Central Railroad of New Jersey: It is agreed between the parties hereto that the proviso in the first of the covenants of the [Navigation Company] in the agreement of March 31, 1871, shall be changed so as to read as follows: 'Provided, that one-fourth and no more of the coal to be mined annually by the Lehigh Coal & Navigation Company from lands owned, leased, or controlled by it, may be sent to market over railroad lines other than the Lehigh & Susquehanna Railroad and branches, in case that by so doing the Lehigh Coal & Navigation Company can realize a larger price or profit than it would have realized from the price at the mines together with its proportion of the freight earnings on such coal on the Lehigh & Susquehanna Railroad and branches if it had been shipped over that railroad; but the Central Railroad of New Jersey shall have the option in such cases of buying such coal of the Lehigh Coal & Navigation Company at its mines, paying therefor a price which, added to the proportion of the freight earnings on such coal accruing to the Lehigh Coal & Navigation Company, shall not be less than that which the Lehigh Coal & Navigation Company would have realized if its coal had been shipped over other lines of railroad. But nothing in this proviso shall be held to limit the shipment of coal by the Lehigh Coal & Navigation Company over the Lehigh & Hudson River Railway to points in the interior of New England, except that the amount of coal shipped by the Lehigh Coal & Navigation Company over the Lehigh & Hudson River Railway, added to the amount that may be sent to market by railroad lines other than the Lehigh & Susquehanna Railroad and branches, shall not in any year exceed 25 per cent. of the total production of its mines.' "

Under the foregoing provisions—and especially under the tenth covenant in the original lease—the defendant made the payments charged to be illegal.

After the lease of 1871, the rates formerly charged to shippers continued without change; that is, all shippers (except the Navigation Company) over either the Lehigh Valley Railroad or the Lehigh & Susquehanna Railroad were obliged to pay two rates—a lateral from the mine to Penn Haven, and a second rate from Penn Haven to Mauch Chunk. The tenth covenant in the lease relieved the Navigation Company from paying the first. Nesquehoning station lies between Mauch Chunk and Hauto, and both parties to the lease understood the tenth covenant to include shipments from Hauto as well as from Nesquehoning; but as Nesquehoning was nearer to Mauch Chunk the rate from Nesquehoning was less than the rate from Hauto. Rates to tide from Nesquehoning were 2 cents less than from Hauto, and way shipments were 4 cents less. After the lateral to Penn Haven was fixed at 14 cents, tide shipments from Nesquehoning were moved for 12 cents, and way shipments were always moved for 16 cents.

From 1873 to 1878 the mines of the Navigation Company were operated by the Lehigh & Wilkes-Barre Coal Company. During this period no change was made in the rates on coal from the Navigation Company's mines. When the Navigation Company resumed mining in 1878, the same rates were continued, except for some variation in the case of shipments to tide. The change was this: All shippers of coal to tide had been charged a rate equal to a certain percentage of the average selling price, and from this rate the Navigation Company

received the allowance referred to. An arrangement was now made that continued the previous difference between the rates charged the Navigation Company and the rates charged the other shippers; that is, the Navigation Company was now charged a rate determined by the number of miles over which its coal was carried in comparison with the average mileage of other shippers. As a result, the Navigation Company only paid 86 per cent. of the average rates charged other shippers, because its mileage was only 86 per cent. of theirs. After 1883, the separate laterals—from the mines to Penn Haven, and from Penn Haven to Mauch Chunk—were abolished, a single charge from the mines to Mauch Chunk being substituted, and after 1885 lower rates were made on smaller sizes; but the relative position of the Navigation Company and the other shippers continued without change. This brings us to the Interstate Commerce Act of 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379).

Up to this time, the favoring rates to the Navigation Company were not forbidden by statute, and it is common knowledge that allowances to important shippers were frequent enough everywhere to be the rule instead of the exception. This was one of the principal abuses at which the act was aimed. After its passage the defendant fixed the rates on anthracite coal by a different method. It abolished the laterals from the mines to Mauch Chunk as separate charges, and it abolished also the percentage basis for calculating the rate on tidewater coal, substituting through rates to destination from all mines in the Lehigh region. In establishing such rates, it followed the long established practice and made the rates on tide shipments lower than the rates on inland shipments—the reason for the practice being the increased competition at tide. The through rates took the old tide rates as the basis, and reduced the inland rates accordingly. In these through rates the old lateral from the mines in the Lehigh region to Mauch Chunk was calculated at 13½ cents.

These through rates were applied to the Navigation Company's shipments, except where its coal competed with Schuylkill coal carried by the Pennsylvania Railroad and the Reading Railroad. The rate on each of these roads from the Schuylkill region was 5 cents less than the rate from the Lehigh region, and, as the Navigation Company's coal and the Schuylkill coal were in the same geological field, that company received a 5-cent reduction to the points of competition. But this practice was given up in 1895, and since that time the Navigation Company's coal has been formally charged the same rates as the coal of other shippers in the Lehigh region. While the 5-cent reduction was in force, it was taken off that portion of the rate representing the haul between the mines and Mauch Chunk; that is, from the old laterals.

As the through rates were formally applied to shipments from all points in the Lehigh region, they applied to the Navigation Company in common with all other shippers; and this might not have violated the tenth covenant in the lease of 1871, since a through rate from Penn Haven would have been the general Lehigh region rate and would have been the same as the rate from Nesquehoning. But—and we

now reach one of the defendant's important positions—it contends that both parties to the lease believed in 1871, as they believed in 1878, when they applied the percentage rate to tidewater shipments, that the real object of the tenth covenant was, not to guarantee a specific rate on the Navigation Company's coal, but to adopt a method of giving the company certain sums of money that should form part of the consideration for the defendant's use of the Lehigh & Susquehanna Railroad and its branches. In other words, although the sums thus to be paid were measured by the old lateral to Penn Haven, they were really not part of the freight rates, but a part of the rent. In 1887, therefore, in order to carry out their understanding and construction of the lease, the parties agreed that through rates should make no difference, and that the Navigation Company should still enjoy in substance the same advantage as in the beginning, and should still in effect pay only one of the two laterals from the mines to Mauch Chunck. The allowance was made in the following manner: In the through rates, 30 or 35 cents represented the old laterals; 14 cents being the Penn Haven lateral if the shipment should be from Hauto, and 12 cents being the same lateral if the shipment should be from Nesquehoning. The defendant therefore allowed the Navigation Company the difference between the through rates and the rates which the Navigation Company would have had to pay if the old percentage basis had been continued, deducting a certain amount that needs no particular attention. And these allowances have been made on all coal shipped from the Navigation Company's mines, whether the freight was paid by the company or by the consignee. Settlements were made each month; the Navigation Company was charged with the tariff rate on all shipments on which it was to pay the freight, and with all other sums due from it to the defendant, and was credited with the allowances referred to and with all other sums due from the defendant, and the balance was then paid to the party entitled thereto. The defendant contends that the allowances were a mere convenience in accounting, in order to ascertain what amount of revenue the leased lines were producing; the Navigation Company being entitled to receive one-third of this revenue under the lease of 1871.

After the Hepburn Act was passed in 1906, the defendant consulted counsel to learn whether these allowances should be referred to in its printed tariffs; it desired to comply fully with the law, and to do nothing that was even doubtful. As the result of this conference, the defendant has published the following note since 1906 in all of its tariffs:

"In compliance with the tenth covenant of the lease from the Lehigh Coal & Navigation Company under which the Central Railroad Company of New Jersey operates the Lehigh & Susquehanna Railroad, a lateral allowance is made out of herein-named rates to the Lehigh Coal and Navigation Company on all anthracite coal originating on the latter's tracks in the Panther creek, Nesquehoning, and Hacklebarnie districts mined and shipped by it, when coming by Hauto, Nesquehoning, and Mauch Chunk gateways.

"The covenant referred to is set forth in the lease of March 31, 1871, and recorded in Deed Book No. 262, page 480, of Luzerne county, and Deed Book No. 43, page 339, of Lackawanna county, Pennsylvania."

Before the indictment was found, 222 tariffs containing this note were filed with the Interstate Commerce Commission. The Commission accepted them all; its careful examination being shown by the facts that some tariffs containing the note were rejected because they were irregular in form, and that other tariffs were (for one reason or another) the subjects of conference between the defendant and members of the Commission. No question was raised by any one concerning the legality or the sufficiency of the note.

The defendant complains that the effect of the judge's charge was to disregard the position that the payments to the Navigation Company were merely part of the consideration for the use of the demised premises, asserting that the trial judge himself resolved this question of fact, and practically instructed the jury that the allowances were concessions from a rate, and could not lawfully be made unless the exact sum was published in the tariffs. The defendant admits that, if certain portions of the charge be read by themselves, the question seems to be left to the jury, but insists that the charge, taken as a whole, and especially in connection with the denial of the defendant's points, amounted to a binding direction to render a verdict of guilty.

[1] 1. The first subject to be considered is the true meaning of the agreement of 1871 in its bearing on the present dispute. In our opinion this is clear enough, and indeed is scarcely controverted, for the differences between the parties are rather verbal than substantial. In 1871 the Navigation Company leased its whole road for a term so long that for all practical and present purposes the defendant should be regarded as the owner, rather than the lessee. As payment for the property thus transferred, the defendant agreed to pay an annual sum, and in addition to give to the Navigation Company certain advantages over other shippers in the same region. By the tenth covenant, the defendant in effect agreed to make no charge for hauling the Navigation Company's coal from the mines to Penn Haven. This is the inevitable result of the covenant, and it makes no difference in what form of words the result is stated. In the end what happened was this: The Navigation Company put more money into its pocket than other shippers from the Lehigh region. They all received market prices for their coal, but the company was obliged to pay out less for freight than was paid by other shippers, and therefore was by so much the better off. Now, whether or not this advantage be stated as a reduction in rates, or merely as a part of the consideration for the lease, seems to be of little importance. What the two companies called it, and in reality understood it to be, appears plainly from the lease and from all the evidence. They chose to put it in the form of a reduction in rates and we shall do them no injustice if we accept their construction. In our opinion they were right in regarding it as part of the consideration, and the government is also right in regarding it as an advantage to the Navigation Company by a reduction in rates. That Congress had power to forbid the continuance of such a practice is not in doubt. Railroad Co. v. Mottley, 219 U. S. 468, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Railroad Co. v. Schubert, 224 U. S. 603, 32 Sup. Ct. 589, 56 L. Ed. 911.

2. The next question in order need not detain us. Assuming as we do (and indeed as we must, in view of the verdict) that the allowances complained of were rebates, they were forbidden in express terms by the statutes regulating commerce, and especially by the Elkins Act, under which the indictment is framed.

3. The defense that the allowances were merely payments for the use of an instrumentality of commerce, and that the note appended to the tariffs was an adequate specification of these sums, requires only a word. The Lehigh & Susquehanna Railroad is not an instrumentality furnished by the shipper, for whose use the carrier may lawfully make compensation. For all present purposes the Lehigh & Susquehanna Railroad is not the property of the Navigation Company, but is the defendant's own property, for the use of which it can make no allowance to a shipper. And as there is no evidence that the Navigation Company rendered any service to the defendant in connection with the delivery of coal at Nesquehoning, nothing appears to support the defense just referred to.

4. Did the court err in the charge to the jury while submitting the question whether the allowances were rebates? In our opinion the instructions need not be considered. We think the court would have been justified in giving a binding instruction in favor of the government. No fact of any importance was in dispute; the only controversy was over the construction that should be put on the original lease and on the subsequent course of dealing between the parties, and, as we have already stated, this was in substance merely a dispute about words. The parties intended to give the Navigation Company an advantage over other shippers in the sale of its coal; they intended to measure that advantage by a certain proportion of the rate for transportation; they always did measure it in that manner, and the intended result was brought about. These facts were not, and could not be, in controversy, and since they constituted the offense denounced by the statute the court would have been justified in so instructing the jury. The defendant cannot complain that the jury was nevertheless allowed to pass upon the question, and manifestly it would be superfluous for us to consider the correctness of what the trial judge said. We must not be understood as criticizing the charge in any respect, but merely as declining to pass upon it.

[2] 5. This being so, it only remains to say that no question of the defendant's good faith could arise. We may assume its intention to comply with the law, and its effort to ascertain its duty; but we cannot relieve it from the consequences of mistake. This subject has been considered and decided by the Supreme Court in Armour v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681. See, also, New Haven R. R. v. United States, 200 U. S. 398, 26 Sup. Ct. 272, 50 L. Ed. 515, Railroad Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, and Railroad Co. v. Lumber Co., 230 U. S. 316, 33 Sup. Ct. 887, 57 L. Ed. 1498.

The judgment is affirmed.