## LEHIGH COAL & NAVIGATION CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit.    May 25, 1920.)

### No. 2136.

1. **Carriers ⊂⇒38—Rate on coal held duly established rate, a departure from which violated Elkins Act.**

   Where the filed and published tariffs of a railroad company specified a rate of $1.55 per ton for coal between two points, but contained a footnote stating that under the terms of a lease of a railroad line from a coal company "a lateral allowance is made out of the herein named rates" to such company on coal shipped by it, the amount of the allowance not being stated, and in practice the company was charged with the named rate against which the allowance was credited, the specified rate of $1.55 per ton *held* the duly established rate for coal, whether shipped by such company or others, a departure from which is unlawful, under the Elkins Act (Comp. St. §§ 8597–8599), as amended by Hepburn Act June 29, 1906.

2. **Criminal law ⊂⇒1189—Disputed question of fact cannot be finally determined by appellate court.**

   Whether evidence introduced by defendant in a criminal case establishes a defense, where a question of fact is involved, is for determination by the jury, and the erroneous striking out of such evidence does not warrant final disposition of the case by the appellate court, but requires its remand for a new trial.

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Criminal prosecution by the United States against the Lehigh Coal & Navigation Company. Judgment of conviction, and defendant brings error. Reversed.

See, also, 250 U. S. 556, 40 Sup. Ct. 24, 63 L. Ed. 1138; Central Railroad of New Jersey v. United States, 229 Fed. 501, 143 C. C. A. 569.

---

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Henry S. Drinker, Jr., and A. M. Beitler, both of Philadelphia, Pa. (Wm. Jay Turner, of Philadelphia, Pa., of counsel), for plaintiff in error.

Henry S. Mitchell and Alexander H. Elder, Sp. Asst. U. S. Attys., both of Washington, D. C.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

WOOLLEY, Circuit Judge. This writ brought here for review a judgment of the District Court entered on the verdict of a jury finding the defendant guilty of knowingly accepting rebates from a duly established rate for the transportation of coal, in violation of the Elkins Act, as enacted in 1903 (32 Stat. 847 [Comp. St. §§ 8597–8599]), and as amended in 1906 (34 Stat. 584).

Aside from the primary question whether the tariffs established a basic rate, departure from which constitutes prima facie the offense of the statute, there arose in this case a question, stated broadly, whether the defendant could be acquitted on proof that it accepted the concessions in the honest belief that it was not disregarding but was in truth complying with entirely lawful provisions of the published tariffs.

The learned trial judge first admitted evidence of the defendant's good faith, but later struck it out on his interpretation that the statute allowed no such defense. Being in doubt about the matter and desiring instruction, we certified the question to the Supreme Court. The certificate was drawn by the late Judge McPherson. No more lucid or exact statement of the complicated situation out of which the question arose can, we think, be made. We shall, therefore, avail ourselves of it for the purposes of this opinion. For a recital in greater detail of the main facts of the case, reference is made to the opinion of this court in Central Railroad Co. of New Jersey v. United States, 229 Fed. 501, 143 C. C. A. 569:

"The foundation of the dispute is the tenth covenant of a railroad lease, or contract, between the Lehigh Coal & Navigation Co. as lessor (hereinafter called the Company), and the Central Railroad of New Jersey as lessee (hereinafter called the Central Railroad). In order to understand the situation, a preliminary statement in some detail is necessary: The Company, which is a miner and shipper of anthracite coal, was indicted, convicted, and fined, in the District Court for the District of New Jersey for accepting rebates and concessions from the Central Railroad in violation of the Elkins Act as amended in 1906. 34 Stat. 584. Each count of the indictment charged a separate offense substantially as follows: As a part of its interstate business, the Central Railroad carries anthracite coal in carload lots. Being subject to the Acts to Regulate Commerce, it filed tariffs and schedules with the Commission, showing its rates and charges for such carriage from the Pennsylvania field to points in New Jersey. During the period covered by the indictment—1912, 1913, 1914, and part of 1915—these tariffs were in force, and under them the Company shipped the carload described in the count from Nesquehoning colliery in Pennsylvania to a specified point in New Jersey. The rate named in the tariff thus became due and payable, but afterward the Company unlawfully and knowingly accepted a portion of such rate from the Central Railroad, so that the coal was carried at less than the rate, and the Company thus received the advantage of an illegal rebate. The indictment

did not charge discrimination. The Company pleaded not guilty, and the case went to trial. The following facts appeared without dispute:

"In March, 1871, the Company owned and operated the Lehigh & Susquehanna Railroad (not a separate corporation), a line running up the Lehigh River from Easton to Wilkes-Barre. The Company itself had built and was operating this line under special legislative authority giving it the powers of a common carrier thereon. It also owned the stock and was the lessee of the Nesquehoning Valley Railroad, a separate corporation, whose line ran from Nesquehoning Junction (a short distance above Mauch Chunk) westward to Tamanend. About half way along this road is Hauto, and at this point a tunnel was being built in 1871 to connect at Lansford with the tracks in the Panther Creek valley south of Nesquehoning. These tracks belonged to the Company, and their principal, if not their only, purpose was to serve its mines in that valley. Between Hauto and the Junction was the Company's Nesquehoning colliery, connected with the Nesquehoning railroad. These mines—at Nesquehoning and in the Panther valley—were and still are the nearest mines to New York bay, and they were the only mines at Nesquehoning or in the neighborhood of Hauto. Farther north in the Lehigh region were mines of other operators, and these were more distant from tide by, say, 10 to 40 miles. These other mines were reached by lateral roads that connected with the Lehigh and Susquehanna line at Penn Haven, several miles north of Mauch Chunk. At Penn Haven these lateral roads had an additional connection—with the Lehigh Valley Railroad, a separate carrier. The accompanying sketch will make the topography more plain:

"In March, 1871, the Company faced the following situation: Its prosperity depended in large measure on the revenue from its Lehigh and Susquehanna line, and this revenue in turn depended on the thru connections of the line at Easton on the Delaware River, the southern terminus. The value of these thru connections was threatened by certain arrangements among the connecting cariers, and mainly for this reason the Company's management decided to lease its railroad properties to one of the connecting carriers, namely, the Central Railroad. Accordingly they made the lease or contract of March 31, 1871, whose tenth covenant has given rise to the present controversy. To understand the covenant properly, other facts should be stated: Before the lease, the Company operated its own line (the Lehigh & Susquehanna) and carried its own coal thereon. Naturally, in leasing the line, it took into account the advantageous nearness of its mines to tide, and sought to insure favorable rates for the coal from these collieries. More precisely, the situa-

tion was this: Referring to the preceding sketch; if Hauto be taken as the end of the western arm of a Y, and Penn Haven as the end of the northern arm—both arms springing from Nesquehoning Junction—the arms will be found of nearly equal length; so that Hauto and Penn Haven are similarly placed for shipments to tide, each being 118 miles from the Bay—Nesquehoning colliery being a few miles nearer.

"At that time rates were calculated from Penn Haven as a base, or from Mauch Chunk as another base. The mines of the other operators that lay northward in the Lehigh region paid three rates; (1) A local or lateral charge to Penn Haven; (2) a charge from that point to Mauch Chunk; and (3) a charge from Mauch Chunk to tide. The charge from Penn Haven to Mauch Chunk had always been the same as the charge from the Company's mines to Mauch Chunk. But the lateral charges to Penn Haven from the mines of the other operators that lay northward of that point had varied from 28 to 72 cents, according to distance. The rate from Hauto to tide was the same as the rate from Penn Haven to tide—this of course being less than the rate from the mines north of Penn Haven, since these mines had to pay a lateral charge to Penn Haven. Nesquehoning colliery had the further advantage of a few miles over Hauto. This situation the 10th covenant was intended to preserve. As one consideration of the lease, the covenant put the Company's coal from Hauto and Nesquehoning on a different footing from the coal of the other Lehigh miners in the north, because the other miners were obliged to get their coal to Penn Haven and to pay the local or lateral rate to that point. The covenant provides, that—

" ' * * * On coal delivered for transportation by (the Company) on sidings at the northern end of the Nesquehoning tunnel, the rates of transportation shall not exceed the rates charged at the same time from Penn Haven to the same points on coal from the Lehigh region, either by the (Central Railroad) or by the Lehigh Valley Railroad Company.'

"About 1878, the method of fixing rates was changed. Penn Haven and Mauch Chunk were no longer used as basing points, and the same rates were fixed for all the mines in the Lehigh region. But, in pursuance of the tenth covenant, the rate to be charged the Company was fixed at 86 per cent. of the rate charged to the other mines in the Lehigh region—the reason being that the distance to tide from Penn Haven, from Hauto, or from Nesquehoning, was 86 per cent. of the average distance from the other mines to the north. While this arrangement was in force, the Company paid a net rate calculated on the basis of 85 per cent. After 1887, the date of the first Act to Regulate Commerce [24 Stat. 379], this method of settlement was changed, and the Company paid, or was charged, the full tariff rate charged to the other Lehigh mines, but was repaid, or was credited with, 14 per cent. thereof—this being done under the obligation or the supposed obligation of the tenth covenant. Between 1887 and August, 1906, when the Hepburn Act went into effect, this arrangement for repaying did not appear in the tariffs filed by the Central Railroad with the Commission. But in August, 1906, and thereafter, the tariffs contained a footnote in the following form:

" '(4) In compliance with the tenth covenant of the lease from the Lehigh Coal & Navigation Company under which the Central Railroad Company of New Jersey operates the Lehigh & Susquehanna Railroad, a lateral allowance is made out of herein-named rates to the Lehigh Coal and Navigation Company on all anthracite coal originating on the latter's tracks in the Panther Creek, Nesquehoning, and Hacklebarnie Districts mined and shipped by it, when coming via the Hauto, Nesquehoning and Mauch Chunk gateways.

" 'The covenant referred to is set forth in the lease of March 31, 1871, and recorded in Deed Book No. 262, Page 480, of Luzerne County, and Deed Book, No. 43, Page 339, of Lackawanna County, Pennsylvania.'

"This footnote is connected by the numeral (4) with the rate of $1.55 specified in the tariff as the rate from Hauto and Nesquehoning to Elizabethport, N. J.; but the footnote does not state how much the allowance is, nor does it furnish any mathematical basis for calculating the amount. All the anthracite coal tariffs filed with the Commission by the Central Railroad after 1906

(262 in number) contained this footnote. The allowance was 19.18 cents per ton. and this was credited in the monthly settlement of the Company's account with the Central Railroad, the credit being the point of the government's attack. The verdict covers 27 shipments of coal in prepared sizes from Nesquehoning colliery for reshipment at Elizabethport. The foregoing facts were either proved or stipulated, and it appeared also without dispute that during the years in question the Company's officers were familiar with the contents of the Central Railroad's tariffs, and knew that the allowance was being made and accepted. One of the Company's defenses was that it had not 'knowingly' accepted a rebate within the meaning of the Act—its contention being, that the allowance had been accepted in good faith, in the honest belief that the payment was justified by the tenth covenant, and also in the honest belief that the allowance was properly and legally noted and provided for in the filed and published tariffs.

"In support of this defense the Company offered evidence that would support the findings—

"(1) That in 1906, at the time the note was made part of the tariffs, the Company's officers were advised by the traffic officials of the Central Railroad, and also by the Railroad's President, by its Vice-President and General Counsel, and by its General Attorney, that the note had been made part of the tariffs in full compliance with the Act of 1906, and were advised also by them that, in view of the note having been made part of the tariffs, the payment and the receipt of the allowance would comply with the tariff and with the law; that the Company's officers trusted and relied upon the judgment of the officers of the Central Railroad.

"(2) That between 1906 and the date of the indictment 262 tariffs, all containing the note, had been filed with and accepted by the Commission.

"(3) That in 1908 the Company had been informed by the Central Railroad, that the Commission (acting by one of its important officials who was in charge of the subject of tariffs) had specifically approved the form of the tariff containing the note, in spite of the fact that the amount of the allowance had not been specified therein—the Commission having under consideration at the time the question whether the payment and the receipt of the allowance under the tariff and footnote were proper; that by reason of such information the Company had thereafter honestly believed that the receipt of the allowance was not in violation of the tariff or of the Act, but was in compliance therwith.

"(4) That examinations of the Company's books, records, and accounts, were made by the Commission's investigators in 1909, and that by reason of such examinations the Commission had been informed that the Company had received, and was receiving, the allowance, but did not object either to the form or to the substance of the practice.

"The Company's evidence concerning good faith was received under the government's objection, and the government offered evidence in contradiction thereof. At the close of the trial the court struck out all the evidence on this subject from the record, and refused to submit the question of good faith to the jury, holding that the Company's honest belief that the allowance was permitted by the tariffs and the footnote thereto could not affect the issue, for the reason that the Company knew the contents of the tariffs, and knew also that the allowance was actually made and received."

The errors which the defendant has assigned in its conviction for knowingly receiving transportation at less than the duly established tariff rate embody three distinct propositions of law:

(1) The tariffs in question did not establish a standard or basic rate, for departure from which a shipper could be held criminally liable.

(2) The question as to whether or not the defendant received transportation at a less rate than that for which it honestly believed the tariff made proper provision should have been left to the jury.

(3) The payments or allowances, being an essential part of the consideration for the ·lease of the Lehigh & Susquehanna Railroad need not have been published or referred to in the tariffs.

With the third proposition, brought forward by the defendant only to preserve its rights in the litigation, we shall do nothing more than formally rule against it, as the same matter has been considered and decided by this court in Central Railroad Company of New Jersey v. United States, ·229 Fed. 501, 143 C. C. A. 569. · The decision in that case sustained the conviction of the railroad company for granting the rebates which the defendant here received and for receiving which it now stands. convicted.

A distinction between the case against the railroad company, the carrier, and this case against the Navigation Company, the shipper, concerning the same rebates, is, that in the former the indictment was framed under both branches of the Elkins Act; first, for charging less than the established tariff rate; and second, for giving an advantage or discrimination to a shipper; while in the latter the offense charged by the indictment is only that of receiving transportation at less than the established tariff rate. It is urged by the defendant in this case the shipper, that the first proposition of law—that no basic rate was established by the tariffs—was neither considered nor decided in the case against the carrier; and that the second proposition, involving the good faith of the shipper in accepting rebates, was of course neither raised nor considered there. The defendant, disclaiming an intention to dispute any of the rulings expressly made in the case against the railroad company, further distinguishes the cases by a difference in the character of the good faith urged as a defense in both, by showing that in this case it does not contend that good faith in reliance on its contract of lease, as contended by the railroad company in its defense, was sufficient to justify its doing what it knew was not provided for by the tariff; but that what it did was under the honest belief, on grounds sufficient to induce that belief, that the receipt by it of the allowances was in compliance with proper provisions of the tariff; the vital difference between the cases being, in a word, the difference between good faith in reliance on a private contract and good faith in the interpretation of a published tariff.

[1] Having thus distinguished the cases, the defendant addressed itself to its first proposition of law. It maintained that before it can be convicted of knowingly receiving transportation at less than the duly established tariff rate, it must affirmatively appear that a tariff rate was duly established. It contended that, far from establishing a standard or basic rate, departure from which is inhibited by law, the tariff, on the contrary, gave specific notice that what purported to be the established rate was not in fact the rate which it, the defendant, was to pay; and that, as it could not depart from a rate that did not exist, it did not, knowingly or otherwise, offend against the statute.

This proposition is based on the defendant's admission that the tariff published and specified the rate of $1.55 a ton on coal from Nesquehoning to Elizabethport, New Jersey, and on its contention that the footnote to this tariff showed that "out of" this rate there would

be made an allowance or deduction in favor of the Navigation Company under the tenth covenant of the recited lease for an undisclosed amount, and that, accordingly, the rate to the Navigation Company was not the published rate of $1.55, but was a lesser rate, not disclosed by the footnote, and, therefore, not published in the tariff.

While there is enough in this contention to arrest our attention, its infirmity is disclosed on brief examination. Though the question of an established rate was not expressly raised in the case against the railroad company (229 Fed. 501, 143 C. C. A. 569), the decision in that case implicitly involved the determination that the $1.55 rate published by the tariffs was the duly established rate for departing from which the railroad company was convicted. Unless the rate from which the railroad company was found to have departed had been duly established, it obviously committed no offense. Moreover, the rate of $1.55 per ton was recognized as the established rate, first, by the railroad company in charging it; and second, by the defendant in paying it, subject to the allowances contemplated by and subsequently made under the terms of the footnote. Aside from the conduct of the carrier and shipper with reference to the rate, an examination of the record discloses, we think with little question, the existence of an established rate. There was a tariff published by the carrier—many tariffs, in fact, but, for convenience, we speak of one. That tariff showed among others a rate of $1.55 from Nesquehoning to Elizabethport. That rate was applicable primarily to every shipper, including the Navigation Company, from the point of shipment to the point of delivery. If the rate had showed nothing more, a drawback or return of a part of it to the Navigation Company would, incontestably, have been a rebate denounced by the law. But added to the published rate of $1.55 between the points named was a footnote which showed that in compliance with the tenth covenant of the lease between shipper and carrier, the public record of which was given, a "lateral allowance" was made "out of herein named rates" to the Navigation Company on coal originating at the point designated. The footnote while disclosing that some deduction would be allowed the shipper out of the published rate, did not show its character by the use of the phrase "lateral allowance" or its amount by reference to the recorded lease, hence it did not show, the defendant maintains, the rate which it was required to pay. It is because of this that the defendant contends, that, as to it at least, there was no rate published, and that, in consequence, it could not commit the offense of receiving a rebate from a rate that did not exist. We think the fault in this contention is the failure of the defendant accurately to distinguish between the published rate applicable to all shippers, including itself, and the net rate paid by it after deducting therefrom the footnote allowance. If in every rebate case we were to accept the "net" as a shipper's "rate," we would always beg the question of a rebate from an established rate. But the net is arrived at only by assuming that $1.55 was the gross or basic rate and by deducting from it the agreed allowance of the footnote. In actual practice extending for a long time over innumerable transactions the net was reached by the carrier charging the ship-

per for transportation at the published rate of $1.55, then crediting it with the agreed allowances and demanding payment for the difference, that is for the "net." While this was the parties' bookkeeping method of adjusting the rates, it was also a book record of the fact that the parties regarded $1.55 as the standard, basic or established rate, from which allowances granted by the carrier and accepted by the shipper were deducted in carrying out in figures the tenth covenant of the lease. Indeed, in stating that allowances would be made the defendant "out of herein named rates" the footnote recognized the published rates as the basis on which to calculate its concessions. Allowances from a rate do not disestablish the rate; it remains just what it was. Neither does an overt or covert deduction from a published rate change the rate or convert it into a new rate.

That both parties regarded $1.55 as an established rate is proven not only by their long continued practice of charging and paying it and granting and receiving deductions out of it, but also by their treatment of the published rate as the standard or basic factor in estimating rentals under the lease of the Lehigh & Susquehanna Railroad. In this lease between the Navigation Company and the Central Railroad Company, whereby the Navigation Company preserved to itself the advantage of its location with reference to tide, the parties did not originally contemplate the granting of a specific rate for transportation of the Navigation Company's coal. They contemplated that "on coal delivered * * * on sidings at the northern end of the Nesquehoning tunnel, *the rates* of transportation *shall not exceed* the rates charged at the same time from Penn Haven." This arrangement was later translated into rates, which by a given percentage to rates from other points preserved its advantage of location, and was still later put into figures and embodied in the flat allowance of 19.18 cents a ton less than the published rate from Nesquehoning to Elizabethport, whatever that rate from time to time might be. In order for the defendant to reap the advantage of location through this allowance there had to be a published rate out of which to take it. Until the carrier made and established such a rate by its tariffs there was no rate on which to calculate the contract deduction or by which to preserve the advantage of closeness to tidewater which the shipper had, and, by its lease, insisted upon retaining.

We are of opinion that the rate of $1.55 per ton, named in the published tariffs, was a duly established rate, and that the learned trial judge committed no error in so charging as a matter of law.

The remaining proposition of law had to do with the good faith of the Navigation Company in accepting allowances out of a lawfully established rate. Our minds inclined to the belief,—against what we regarded to be the trend of the decisions,—that, under the circumstances of this case, evidence of the defendant's good faith or honest belief in these transactions should have been admitted by the trial judge and submitted to the jury. In this situation, we asked the Supreme Court for instruction (section 239 of the Judicial Code [Comp. St. § 1216]), on a certificate containing the following question:

"In the criminal prosecution of a shipper for knowingly accepting transportation at less than the duly established rate by receiving an allowance that was referred to in the tariff but was not specified in figures therein, has the defendant a right to offer evidence that the allowance was received under the honest belief that it was lawfully established by the tariff, and under the honest belief that in receiving it he was not disregarding what he believed to be the provisions of the tariff but was complying therewith?"

The Supreme Court has answered this question in the affirmative (Lehigh Coal & Navigation Co. v. United States, 250 U. S. 556, 40 Sup. Ct. 24, 63 L. Ed. 1138), distinguishing Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681, and saying that the circumstances under which the Navigation Company sought to justify its acceptance of the allowances "can bring into action and exculpatory effect the provision of the statute which requires the acceptance of a rebate to be 'knowingly' done to incur the guilt of a misdemeanor." As evidence of this character was excluded at the trial, after first being admitted, it now appears that the trial judge fell into error; and that, unless there is substance in the remaining contentions of the parties, the case should be remanded for retrial.

[2] At the rehearing of this case, following the Supreme Court's instruction on the matter of the defendant's honest belief, counsel for both parties contended that the case should not, for exactly opposite reasons, be returned to the District Court for another trial, but could and should be finally disposed of by this court; the contention of the Government being, that the defendant's evidence of honest belief, if it had not been excluded, would not have sustained that defense, and would, therefore, have required the trial judge to direct a verdict against the defendant; the contention of the Navigation Company being, that its evidence of honest belief, if it had not been excluded, would, in view of the lack of evidence controverting it, not only have sustained the defense, but would have required the trial judge to direct a verdict for the defendant. We are not impressed by either contention. The Supreme Court has said, in substance, that upon the facts shown in our certificate the defense of honest belief is open to the defendant. These facts were drawn from the testimony under constructions most favorable to the defendant, in order to follow the practice, in certifying questions to the Supreme Court, of giving the facts, not the testimony, on which the questions are predicated. Whether a jury would find the same facts from the same testimony is quite another matter; especially as we regard the testimony to be such that reasonable men might draw different conclusions from it. We therefore direct that the judgment below be reversed and a new trial be had in accordance with the opinion of the Supreme Court and with this opinion.