J-A23021-24

2025 PA Super 225

| READING BLUE MOUNTAIN AND NORTHERN RAILROAD COMPANY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : : : : | |
| v. | : : : | |
| | : | No. 68 MDA 2024 |
| TIMOTHY AND SUEANN MOUNT | : | |

Appeal from the Judgment Entered January 3, 2024
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
201505426

BEFORE:  BOWES, J., OLSON, J., and STABILE, J.

DISSENTING OPINION BY OLSON, J.:    **FILED: OCTOBER 1, 2025**

I respectfully dissent from the learned Majority, as I cannot take away from the people of this great Commonwealth that property which Appellant, Reading Blue Mountain and Northern Railroad Company ("BM&N"), holds in trust for them based upon the evidence presented. Moreover, it is not within the providence of this Court to re-write more than 175 years of well-established law governing railroads and the property used in railroad operations. Based upon the record currently before us, I would vacate the January 3, 2024 judgment and remand the case for a new trial.

The record demonstrates that BM&N owns railroad property for the purpose of operating an active railroad line that passes through the town of White Haven located in Luzerne County, Pennsylvania. Timothy and Sueann Mount (collectively, "the Mounts") own three parcels of real property (the eastern portions of Lots 47, 49, and 51) that are located immediately adjacent

to a portion of BM&N's railroad property.  For reference purposes, the following diagram illustrates the Mounts' property (Lots 47, 49, and 51), as well as the railroad tracks located to the west of Main Street (formerly referred to as "Railroad Street").[1]

_____

[1] The image also depicts BM&N's asserted location of the boundary line of its property (identified as "Reading and Northern Property Line").  I use this image for reference purposes only.



As the Majority notes, a dispute arose, in 2014, concerning the location of the boundary line between BM&N's railroad property and the real property owned by the Mounts. The parties were unable to resolve their boundary line dispute amicably and, in 2015, BM&N filed a complaint that set forth causes of action for ejectment and trespass against the Mounts. In their counterclaims, the Mounts raised causes of action to quiet title, for trespass,

and for set-off.  The Majority has set forth the procedural posture of the case thereafter, and I incorporate that portion of the Majority's opinion herein.  **See** Majority at *2-*5.

Ultimately, the trial court issued a verdict on September 18, 2023, finding in favor of BM&N on its claims for ejectment and trespass but "only to the extent that [the Mounts] occupy any portion of land that extends into [BM&N's] easterly railroad right-of-way."  Verdict, 9/18/23, at ¶2.  The trial court also found in favor of BM&N on the claims for trespass and set-off raised as part of the Mounts' counterclaims.  **Id.** at ¶4.  The trial court found in favor of the Mounts on their claim to quiet title "with respect to only that portion of land that is within their property depth from Main Street."  **Id.** at ¶3.

In reaching its September 18, 2023 verdict, the trial court found that the Mounts' property (the eastern portions of Lots 47, 49, and 51) extended "in a westerly direction from Main Street to the edge of [BM&N's] easterly railroad right-of-way, which, for purposes of this litigation[,] shall be a line measured [12½] feet from the centerline of the existing tracks of [BM&N's] railroad."  **Id.** at ¶1.  In other words, the trial court found that the eastern boundary line of BM&N's property was located further west and closer to the railroad tracks than what BM&N asserted in the diagram supra and identified as the "Reading and Northern Property Line."  The trial court's finding also meant that no portion of the Mounts' building located on Lot 47 was situated within BM&N's property.  The trial court did not award either party monetary damages.  **Id.** at ¶5.

- 4 -

The Majority sets forth the issues raised by BM&N on appeal, as well as our standard and scope of review in an appeal from a judgment entered on a non-jury verdict. *See* Majority at *8-*10. Collectively, BM&N challenges the trial court's determination as to the location of the eastern boundary line of its railroad property and, relatedly, the trial court's determination that the Mounts' building did not encroach upon BM&N's property. BM&N's Brief at 21-44. Additionally, BM&N objects to the trial court's conclusion that the doctrine of laches barred BM&N from ejecting the building owned or occupied by the Mounts to the extent it encroached upon BM&N's property. *Id.* Because I would vacate the judgment and remand this case for a new trial, I find it necessary to address BM&N's issue concerning the doctrine of laches.

**Doctrine of Laches**

BM&N asserts that "the trial court erred when it determined that the doctrine of laches barred [BM&N's] claim in ejectment."[2] Appellant's Brief at 30. BM&N's uncontested evidence showed that its "right-of-way was actively used by a common carrier railroad for railroad purposes" and, as such, BM&N claimed the doctrine of laches did not apply. *Id.* at 30, 32. BM&N contends

---

[2] While the trial court found in favor of BM&N as to its claim for ejectment, the trial court limited its finding such that BM&N was entitled to ejectment "only to the extent that [the Mounts] occupy any portion of land that extends into [BM&N's] easterly right-of-way." Verdict, 9/18/23, at ¶2. The trial court's determination that BM&N's property extended easterly 12½ feet from the centerline of the existing railroad track precluded a finding that the Mounts' building on Lot 47 was, in part, located within BM&N's property. *See id.* at ¶1.

that "[i]t is well-settled that the right[-]of[-]way of a railroad company, whatever its established width, as soon as acquired[,] is impressed with a public use[ and] constitutes a public highway." *Id.* at 28 (original quotation marks omitted), *citing **Conwell v. Philadelphia & Reading Ry. Co.***, 88 A. 417, 418 (Pa. 1913). BM&N further contends that, as public property or a public highway, BM&N's railroad right-of-way "is not subject to the equitable defense of laches." Appellant's Brief at 28 (asserting that, BM&N holds its railroad property "in trust for the people of the [C]ommonwealth"). BM&N asserts that the trial court's reliance on our Supreme Court's decision in ***Delaware, Lackawanna & Western R.R. Co. v. Tobyhanna Co.***, 77 A. 811 (Pa. 1910) to support the conclusion that the defense of laches was applicable to BM&N's claim seeking ejectment was misplaced. Appellant's Brief at 31. BM&N contends that our Supreme Court, in ***Delaware, Lackawanna & Western***, ***supra***, held that the doctrine of laches could be asserted as a defense in a claim involving land acquired by a railroad company **only if** the property was outside the railroad right-of-way and never appropriated by the railroad company for railroad use, thus not taking on the designation as "a public highway." *Id.* at 32. In BM&N's view, the decision in ***Delaware, Lackawanna & Western***, ***supra***, reinforced the principle that the doctrine of laches was not applicable in a claim involving a railroad's property that is actively used by a railroad company for railroad purposes. *Id.* BM&N argues that, because the property in question was used as part of its railroad

operations, the trial court erred in finding that the doctrine of laches was applicable and in barring BM&N's action for ejectment. ***Id.***

In finding that the doctrine of laches applied in the case *sub judice*, the trial court explained:

> As stated in **Harbor Marine Co. v. Nolan**, 366 A.2[d] 936, 939 (Pa. Super. 1976)[,] "The plaintiff's burden in an action in ejectment is clear. It must establish a right to immediate exclusive possession[,] and it must do so on the strength of its own title, not on the weakness of the defendant's [title]." [] In addition, equitable defenses such as the doctrine of laches are available in an ejectment action. ***Id.***[; **see also**] **Kardos v. Morris**, 368 A.2[d] 657, 660 (Pa. 1977) ([stating, e]quitable defenses are applicable to actions in ejectment). Furthermore, "the application of the equitable doctrine of laches does not depend upon the fact that a certain definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the complaining party is guilty of want of due diligence in failing to institute [an] action to another's prejudice." **Wilson v. King of Prussia** [**Enters.**]**, Inc.**, 221 A.2[d] 123, 126 (Pa. 1966).
>
> In the present case, the evidence adduced at trial established that [BM&N] acquired its title by virtue of a deed from Consolidated Rail Corporation [("Conrail")], dated August 19, 1996, and recorded in Luzerne County Deed Book 2587, at Page 45 *et seq*. The language of the deed appears to be that of a "quitclaim" deed and specifically states (at Page 46) that the conveyance is "UNDER and SUBJECT, however, to . . . (3) any easements or agreements of record or otherwise affecting the [property], and to the state of facts which a personal inspection or accurate survey would disclose[.]" There was no dispute at trial that [the Mounts'] building existed in its current location at the time [BM&N] acquired its title in 1996. In fact, there is convincing evidence that the building has been in its present location at least as far back as 1903, when it was part of a feed mill operation that included another building to its south which was razed sometime prior to [the Mounts'] ownership.
>
> In addition, [] Timothy Mount[ ("Mr. Mount")] testified credibly as to how he and his wife, Sueann Mount, used the premises during

- 7 -

the period of their occupancy and ownership from 1998 up until the time of the trial in this matter. During direct examination by his counsel, Mr. Mount authenticated multiple photographs[,] as well as an occupancy permit dated March 8, 2000, and a building permit dated August 8, 2000, which documented the work performed by [the Mounts] from the time they took possession of the property until they opened their restaurant, the Feed Mill Restaurant, in June [] 2000. He also testified that they spent in excess of $80,000[.00] renovating the building and that they operated the restaurant continuously from [June] 2000[,] until September or October [] 2018, when it closed.

Additionally, Mr. Mount testified that from the time they occupied the property, up until the summer of 2014, no representative of [BM&N] ever contacted them for any purpose. He further testified that during that same time period, and even up through the time of trial, [BM&N's] trains continued to run behind their property on a daily basis. According to Mr. Mount's testimony, it was not until he approached the conductor of one of [BM&N's] trains (in the summer of 2014) about his concern that the passengers being let off of the train for bicycle ride tours were crossing [the Mounts'] property, that he was approached by someone on [BM&N's] behalf. Shortly thereafter, he testified, a railroad representative presented him with a lease to sign, and not long after that, [BM&N] filed the instant action. Nothing in [BM&N's] case-in-chief or its counsel's cross-examination of Mr. Mount contradicted his version of the history and events leading up to the instant litigation.

As [our] Supreme Court stated in **Wilson**[, **supra**,] "the question of laches is factual and to be determined by an examination of the circumstances." An examination of the circumstances surrounding this matter convinced the [trial] court that [BM&N] "is guilty of want of due diligence in failing to institute its action to [the Mounts'] prejudice." [**Wilson**, 221 A.2[d] at 126.] At the time [the Mounts] first began their occupancy of the property in 1998, [BM&N] already owned the railroad [property]. From 1998 until present, [BM&N] has run its train without any interference or disruption from [the Mounts'] use of their adjoining property. In fact, it fairly appears that [the Mounts'] building has been in its present location for over [120] years without interfering with [BM&N's] railroad operation whatsoever. Despite this, [BM&N] requested [the trial] court to order [the Mounts] to demolish a considerable portion of their building in which they have invested substantially, a fact of which [BM&N] had constructive, if not

- 8 -

actual, notice. Taking all of this into consideration, the [trial] court concluded that the equities of this case strongly favor [the Mounts] and found that [BM&N's] ejectment action is barred by the doctrine of laches.

Trial Court Opinion, 3/8/24, at 4-7 (original brackets, footnotes, record citations, and extraneous capitalization omitted).[3]

I concur with the trial court that, typically, the doctrine of laches applies in actions for ejectment. **See id.** at 4; **see also Kardos**, 368 A.2d at 660; **Harbor Marine**, 366 A.2d at 939 n.3. The availability of the doctrine as an equitable defense, however, is not absolute. **See PA Energy Vision, LLC v. South Avis Realty, Inc.**, 120 A.3d 1008, 1014-1015 (Pa. Super. 2015), *appeal denied*, 138 A.3d 6 (Pa. 2016).

The doctrine of laches is an affirmative defense in equity "whose purpose is the repose of title, claims[,] and demands for the peace and order of society." **Williamstown Borough Auth. v. Cooper**, 591 A.2d 711, 714 (Pa. Super. 1991); **see also Fulton v. Fulton**, 106 A.3d 127, 131 (Pa. Super. 2014) (stating that, "[t]he doctrine of laches is an equitable bar to the prosecution of stale claims and is the practical application of the maxim that 'those who sleep on their rights must awaken to the consequence that they have disappeared'" (citation and original quotation marks omitted)). "Its application is not tied to a definite passage of time after accrual of a cause of action. Rather, it relates to whether, under the circumstances of a particular

---

[3] For ease of identification, I assigned page numbers to the trial court's unpaginated Rule 1925(a) opinion.

case, a party can be charged with lack of due diligence in failing to institute a claim." **Williamstown Borough**, 591 A.2d at 714; **see also Fulton**, 106 A.3d at 131 (stating, the question of whether, or not, the doctrine of laches applies "is factual [] and is determined by examining the circumstances of each case"). For the doctrine of laches to apply, the adverse party must have been injured or materially prejudiced because of the delay in bringing about the cause of action for ejectment.[4] **Williamstown Borough**, 591 A.2d at 714; **see also Fulton**, 106 A.3d at 131.

It is well-established that, "the right[-]of[-]way of a railroad company, whatever its established width, as soon as acquired is impressed with a public use; it constitutes a public highway. The railroad company holds it in trust for the people of the Commonwealth." **PA Energy**, 120 A.3d at 1014 (original quotation marks and brackets omitted), *citing* **Conwell**, 88 A. at 418; **see also A.D. Graham & Co. v. Pennsylvania Turnpike Comm'n**, 33 A.2d 22, 31 (Pa. 1943). "The law thus creates a fiction that the Commonwealth owns railroad rights-of-way[, and u]nder the doctrine of *nullum tempus occurrit regi* (no time runs against the King), one cannot acquire property from the Commonwealth by adverse possession[, or pursuant to the doctrine of

---

[4] "The question of whether laches applies is a question of law[, for which our standard of review is *de novo* and our scope plenary. T]hus, we are not bound by the trial court's decision on the issue." **Fulton**, 106 A.3d at 131.

laches.]"[5] **PA Energy**, 120 A.3d at 1014-1015 (reiterating that, "the doctrine of laches cannot succeed where the analogous claim of adverse possession fails"); **see also City of Pittsburgh v. Pittsburgh & Lake Erie R.R. Co.**, 106 A. 724, 727 (Pa. 1919) (stating, "[a]n obstruction in a public highway does not gain a legal status by lapse of time nor by inaction[;] laches will not be imputed to the [C]ommonwealth"); **Commonwealth v. Moorhead**, 12 A. 424, 426 (Pa. 1888) (stating, "public rights are not destroyed by long-continued encroachments or permissive trespasses"); **Williamstown Borough**, 591 A.2d at 715; **A.D. Graham**, 33 A.2d at 31; **Western New York & Pennsylvania Ry. Co. v. Vulcan Foundry & Mach. Co.**, 96 A. 830, 831 (Pa. 1916); **Commonwealth, Dep't of Transp. v. J.W. Bishop & Co., Inc.**, 439 A.2d 101, 103 (Pa. 1981).

It is undisputed that BM&N possesses an interest in the property which extends easterly to the boundary line established by the railroad right-of-way, and which also forms the western boundary line of the Mounts' property. This interest was conveyed to BM&N by quit-claim deed from a trustee for Conrail

---

[5] The doctrine of *nullum tempus occurrit regi* has been codified in Section 88 of Title 68, Chapter 2 – Claim by Adverse Possession of the Pennsylvania Consolidated Statutes, which reads as follows:

> Nothing contained in this act shall be construed to give any title to any lands by a claim of title adverse to that of the Commonwealth of Pennsylvania, and no claim of title adverse to the Commonwealth of Pennsylvania shall be made or recorded under the provisions of this act.

68 P.S. § 88.

on August 19, 1996.[6]  ***See*** Plaintiff's Exhibit P-3 (stating, Conrail "has remised, released[,] and quit[-]claimed" to BM&N "all right, title[,] interest" of Conrail to "a portion of the line of railroad known as the Lehigh Middle Cluster, situate[d] in[, *inter alia*, Luzerne County]").[7]  Conrail held the

_____

[6] In describing the features of a quit-claim deed as a method of property conveyance, our Supreme Court offered the following observations:

> The distinguishing characteristic of a quit[-]claim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself.  . . .  One who receives a quit-claim deed to a property must proceed with caution if he[, or she,] seeks to possess himself[, or herself,] of that property.  By securing a quit-claim deed[,] he[, or she,] has eliminated only one person who might bar his[, or her,] ingress to that property.  A quit-claim deed contains no covenant of peaceful possession.

***Greek Cath. Congregation of Borough of Olyphant v. Plummer***, 32 A.2d 299, 300 (Pa. 1943).

[7] The statutory provisions that construe the term "quit-claim" when used in a deed or other instrument for conveying or releasing land confirm our Supreme Court's observations as set forth in ***Plummer***, ***supra***.

> Whenever, in any deed or instrument in writing for conveying or releasing land, there shall be used the words "release and quit claim," such deed or instrument in writing or conveying or releasing land shall be construed as if it set forth that the grantor or grantors hath or have remised, released, and quit-claimed, and by these presents doth or do remise, release, and forever quit-claim, unto the grantee, his [or her] heirs and assigns, all right, title, interest, property, claim, and demand whatsoever, both in law and in equity, in or to the lands or premises released, or intended so to be, so that neither the grantor or grantors, nor his [or her] or their personal representatives, his [or her] or their heirs or assigns, shall, at any time thereafter, have, claim,

property "in trust for the people of the Commonwealth," by virtue of its use of the property for purpose of maintaining an active railway, and, therefore, upon conveyance and continuation of the rail business, BM&N similarly holds the property "in trust" as an active railroad right-of-way.  ***See PA Energy***, 120 A.3d at 1014; ***see also A.D. Graham***, 33 A.2d at 28.

I concur with the trial court, and the record supports, that the quit-claim deed contained a clause stating BM&N received title to the property "under and subject, however, to . . . any easements or agreements of record or otherwise affecting the [property], and to the state of facts which a personal inspection or accurate survey would disclose[.]"  Plaintiff's Exhibit P-3 at 2 (extraneous capitalization omitted); ***see also*** Trial Court Opinion, 3/8/24, at 5.  These conveyance terms have only limited consequence, however, in the present circumstances.

Where the parties to a deed do not both engage in active railroad operations, I agree that such language could place the grantee on notice that a property interest received *via* a quit-claim deed may be subject to adverse claims of title by third parties through, *inter alia*, adverse possession, prescriptive easement, or laches.  Where the parties to a deed are, however, two railroad companies who engage in active railroad operations, such as in

---

challenge, or demand the said lands and premises, or any part thereof, in any manner whatever.

21 P.S. § 7.

- 13 -

the case *sub judice*, the conveyance terms utilized in a quit-claim deed do not weaken the long-landing principle that public highways, including railroad rights-of-way, are immune to claims of, *inter alia*, adverse possession, prescriptive easement, or laches.[8]

In reaching this conclusion, I considered the contrasting principles distilled from the decision issued by the Court of Appeals of Ohio, Union County in ***Kamenar R.R. Salvage, Inc. v. Ohio Edison Co.***, 607 N.E.2d 1108 (Ohio Ct. App. 1992). In ***Kamenar***, ***supra***, the Ohio Court of Appeals found, *inter alia*, that Kamenar Railroad Salvage, Inc. ("Kamenar") acquired ownership of a railroad's right-of-way property *via* a quit-claim deed from Conrail. Because a quit-claim deed conveyed the right-of-way property to Kamenar, the property was deemed "subject to" power lines that ran across the property, which had been erected and maintained by Ohio Edison Company, and its predecessors, (collectively, "Ohio Edison"). ***Kamenar***, 607 N.E.2d at 1113. The quit-claim deed between Conrail and Kamenar contained identical language to the quit-claim deed in the case *sub judice* that was entered into between Conrail and BM&N, in that, the quit-claim deed stated that Kamenar took the right-of-way property "under and subject, however, to

_____

[8] In this instance, the two railroad companies actively engaged in railroad operations and are not subject to claims of, *inter alia*, adverse possession, prescriptive easement, or laches because both railroad companies enjoy the protections afforded by the well-established doctrine that no time runs against the sovereign and there can be no lack of due diligence or possession which is adverse.

. . . any easements or agreements of record, or otherwise affecting the [property] and to the state of facts which a personal inspection or accurate survey would disclose[.]" *Id.* at 1109-1110. In *Kamenar*, *supra*, Pennsylvania Railroad Company, the predecessor to Conrail, entered into agreements with Ohio Edison that gave Ohio Edison the right to erect and maintain "wires, cables, and the like upon the railroad's right-of-way[.]" *Id.* at 1110. The Ohio Court of Appeals found that the agreements constituted "licenses coupled with an interest and, therefore, [were] irrevocable (except upon mutual agreement, abandonment, or removal), transferable, and assignable."[9] *Id.* at 1113. As such, because the agreements were irrevocable, transferable, and assignable, the Ohio Court of Appeals concluded that Ohio Edison's right to erect and maintain the wires and cables on the railroad right-of-way property "did not terminate when Conrail conveyed its interest in the land to [Kamenar]." *Id.* Moreover, the Ohio Court of Appeals held that the "under and subject to" language in the quit-claim deed prevented Kamenar from asserting that it took possession of the right-of-way property

_____

[9] The Ohio Court of Appeals stated that it could not conclude that the agreements constituted express easements because the agreements were not witnessed and acknowledged, as is required, by Ohio law, for a conveyance of an interest in real property, such as an easement. *Kamenar*, 607 N.E.2d at 1111. The Ohio Court of Appeals concluded that the agreements were licenses coupled with an interest because, by definition, a license coupled with an interest was an easement that did not comply with the formalities to create an easement. *Id.* at 1112.

- 15 -

without the burden on its title created by Ohio Edison's license and the continued existence of the powerlines. *Id.*

While the Ohio Court of Appeals in *Kamenar*, *supra*, found that Kamenar took possession of the former railroad property *via* a quit-claim deed and subject to Ohio Edison's interest in the real property, I find this case distinguishable. First, Ohio Edison erected and maintained its power lines across the property **pursuant to a license agreement** it entered into with Kamenar's predecessor-in-interest, which operated an active railroad on the property. Unlike *Kamenar*, in which Ohio Edison erected power lines on the property pursuant to an agreement with Kamenar's railroad predecessor-in-interest, no agreement exists in the case *sub judice* under which the Mounts (or their predecessors) acquired from BM&N or Conrail (or their predecessors) the right to build or maintain their structure in its present location if, in fact, the structure is located on BM&N's property.

Second, the Ohio Court of Appeals affirmed summary judgment in favor of Ohio Edison, and against Kamenar, after concluding, *inter alia*, that Kamenar acquired the railroad's property subject to "any easements or agreements . . . affecting the land" and "the state of facts which a personal inspection or accurate survey would disclose." *Id.* at 1113. The "under and subject to" clause in the quit-claim deed to Kamenar convinced the Ohio Court of Appeals that, in addition to finding that Kamenar's predecessor-in-interest intended to convey to Ohio Edison permanent and irrevocable rights in the land which survived a subsequent transfer, Kamenar acquired the property

subject to a "state of facts" discoverable through an inspection or survey, including the existence of overhead power lines. *Id.*

Owing to these distinctions, the decision in *Kamenar*, *supra*, offers no guidance and furnishes little to no persuasive value in the case *sub judice*. Kamenar obtained its interest in the property after its railroad predecessor-in-interest contractually conveyed certain interests in the property to Ohio Edison. The Ohio Court of Appeals specifically determined that the permanent and irrevocable character of these contractually conveyed interests, coupled with the language of the quit-claim conveyance to Kamenar, compelled the conclusion that Kamenar accepted the property subject to Ohio Edison's power lines. *Kamenar*, 607 N.E.2d at 1113. No similar contractual agreement conveying an interest in the property to the Mounts is present in the case *sub judice*.

Moreover, *Kamenar*, *supra*, sheds no light on the legal consequences that might arise from BM&N's observation of the Mounts' building through inspection or survey.[10] As suggested above, the Ohio Court of Appeals concluded, in part, that Kamenar acquired its property subject to Ohio Edison's power lines because it was "undisputed that [Kamenar] knew of [Ohio Edison's] power lines at [the time of acquisition.]" *Id.* Under these

---

[10] Even if BM&N observed the Mounts' building prior to accepting the quit-claim deed from Conrail, the observations would be of no consequence because, as active railroad property, the railroad right-of-way property is immune from claims of, *inter alia*, adverse possession, prescriptive easements, and laches.

- 17 -

circumstances, the quit-claim deed between Kamenar and its railroad predecessor-in-interest, which transferred a property interest "subject to the state of facts which a personal inspection or accurate survey would disclose," had the effect of transferring to Kamenar the burden on the title which was created by Ohio Edison's license to erect and maintain power lines. But Kamenar was a railroad **salvage** company, not a railroad company. Because Kamenar did not use the property to operate an active railroad line, and, therefore, the property no longer constituted a "public highway," the Ohio Court of Appeals had no occasion to consider what impact the special status of a "public highway" would have on a **railroad**'s right to challenge a competing property interest, or whether competing property interests (accrued or acquired through the passage of time) could be asserted against an active railroad operator that acquired railroad property through a quit-claim deed.[11] Since **Kamenar**, **supra**, did not address the unique concerns before us, where an active railroad operator whose property occupies a special status under the law as a "public highway," I am not persuaded that the decision offers definitive guidance in the present circumstances.

_____

[11] Like courts in Pennsylvania, Ohio courts have recognized that property acquired by a railroad company for the purpose of maintaining active railroad operations takes on the status of a "public highway" or property for public use through the exercise of sovereign powers and, therefore, the property is immune to claims adverse to its continued public use. **See State ex rel. McGhee v. Black Diamond Co.**, 119 N.E. 195 (Ohio 1917); **see also Smith v. Pittsburgh, Cincinnati, Chicago, and St. Louis Ry. Co.**, 26 Ohio C.C. 44, 1904 WL 1137, _aff'd_, 78 N.E. 1137 (Ohio 1906); **Houch v. Bd. of Park Comm'rs of the Huron County Park Dist.**, 876 N.E.2d 1210 (Ohio 2007).

BM&N, in the case *sub judice*, continues to operate an active railroad and obtained its interest in the property from Conrail, a predecessor-in-interest that also operated a railroad on the land. Under Pennsylvania law, therefore, the property retained its character as a public highway due to continuous railroad operations. ***PA Energy***, 120 A.3d at 1014; ***see also Conwell***, 88 A. 418; ***A.D. Graham***, 33 A.2d at 31. As such, the doctrine of laches does not preclude BM&N from asserting its rights against the Mounts and no adverse property interest can be asserted against BM&N under a theory of adverse possession, prescriptive easement, or laches. ***PA Energy***, 120 A.3d at 1014-1015; ***see also Pittsburgh & Lake Erie R.R.***, 106 A. at 727; ***Moorhead***, 12 A. at 426, ***Williamstown Borough***, 591 A.2d at 715; ***A.D. Graham***, 33 A.2d at 31; ***Vulcan Foundry***, 96 A. at 831; ***J.W. Bishop***, 439 A.2d at 103.

This conclusion is further supported by our Commonwealth Court's decision in ***In re Rights of Way and Easements Situate in the Township of Mt. Pleasant*** ("***Township of Mt. Pleasant***"), 47 A.3d 166 (Pa. Commw. 2012), *appeal denied*, 63 A.3d 1250 (Pa. 2013).[12] In ***Township of Mt. Pleasant***, ***supra***, our Commonwealth Court determined that Raymond and Patricia Alincic (collectively, "the Alincics") possessed an ownership interest

---

[12] "This Court is not bound by decisions of the Commonwealth Court. However, such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." ***Petow v. Warehime***, 996 A.2d 1083, 1089 n.1 (Pa. Super. 2010) (citation omitted), *appeal denied*, 12 A.3d 371 (Pa. 2010).

by adverse possession in the property formerly owned by Penn Central Railroad ("Penn Central") and on which Penn Central previously operated a railroad line. *Township of Mt. Pleasant*, 47 A.3d at 174. By way of background, Penn Central operated an active railroad line on the property until sometime in 1974, when it removed the railroad tracks but left the railroad ties on the property. *Id.* at 170, 173 n.8. In 1983, Penn Central presented an offer to the Alincics to purchase Penn Central's interest in the property, which the Alincics declined. *Id.* at 170. In 1984, the Alincics "erected a fence around the entire perimeter of [their] land, including [Penn Central's property] and continuously maintained this fence from 1984 to 2008 (a period of more than 21 years)." *Id.* In 1993, Malkan, Inc. ("Malkan") purchased the property from Penn Central *via* a quit-claim deed. *Id.* The record demonstrated that the Alincics established the necessary elements of adverse possession, namely that they proved actual, continuous, visible, notorious, distinct and exclusive, and hostile possession of the property for a period of 21 years or more. *Id.* at 173-174. The Commonwealth Court recognized the well-established principle that "a railroad is part of a public use and, therefore, cannot be adversely possessed." *Id.* at 173 n.8. The Commonwealth Court held, however, that "once a railroad easement is abandoned, the right-of-way is extinguished" and so too are the protections afforded it against claims of, *inter alia*, adverse possession, prescriptive easements, and laches. *Id.* The Commonwealth Court found that "not only did [Penn Central] remove the [railroad] tracks in 1974, but it also engaged in negotiations with both the

- 20 -

Alincics and Malkan to purchase the railroad right-of-way." *Id.* These actions by Penn Central, the Commonwealth Court concluded, constituted abandonment, thereby, permitting the Alincics to adversely possess the property. *Id.* Having found that Penn Central ceased active railroad operations and abandoned the railroad property, thereby extinguishing the protections afforded to the property as a public highway, Malkan, who acquired the property *via* a quit-claim deed, took possession of the property "under and subject to" any claims of, *inter alia*, adverse possession and laches. *Id.*

*Kamenar*, *supra*, and *Township of Mt. Pleasant*, *supra*, illustrate factual instances where the "under and subject to" clause of a quit-claim deed effectively burdens the title conveyed to a grantee and subjects the grantee to claims of, *inter alia*, adverse possession. In these cases, either the absence or abandonment of active railroad operations allowed the quit-claim conveyance clause to transfer conditions that burdened the titles or interests accepted by the grantees. Such is not the case, however, when the grantee to a quit-claim deed is a railroad company and the property continues as an active railway. *Pennsylvania R.R. Co. v. Guthrie*, 66 Pa. Super. 470, 472 (Pa. Super. 1917) (stating, "[i]t is true that a railroad company cannot acquire title by adverse possession nor can a claimant against such company"); *see also Lawson v. Simonsen*, 417 A.2d 155, 159 (Pa. 1980) (supporting the premise that traditional property law maxims do not apply to railroad companies and railroad right-of-way property). It is well-established that,

under the doctrine of *nullum tempus occurrit regi*, one cannot acquire a property interest in a railroad's right-of-way by employing, *inter alia*, claims of adverse possession or laches. **PA Energy**, 120 A.3d at 1014-1015; **see also Williamstown Borough**, 591 A.2d at 715; **A.D. Graham**, 33 A.2d at 30-31.

The trial court, in the case *sub judice*, held that "in certain circumstances (**such as those in the instant case**), adverse possession [or the analogous defense of laches] is available as against railroad property so long as the property claimed is not with[in] the railroad right-of-way." Trial Court Opinion, 3/8/24, at 11 (emphasis added), *citing*, **Delaware, Lackawanna & Western**, *supra*. To the extent that the trial court relied upon our Supreme Court's decision in **Delaware, Lackawanna & Western**, *supra*, to support its finding that the defense of laches bars Appellant's action for ejectment, I find that reliance to be misplaced as the circumstances in the case *sub judice* are not analogous to those found in **Delaware, Lackawanna & Western**, *supra*.

In **Delaware, Lackawanna & Western**, *supra*, the railroad company purchased a tract of **additional land adjoining its right-of-way property**. **Delaware, Lackawanna & Western**, 77 A. at 812. When the railroad attempted to utilize the additional land, it discovered that the Tobyhanna Company was in possession of, and claimed title to, the land by adverse possession. **Id.** Our Supreme Court reiterated that the railroad's right-of-way property constituted a "public highway" and, as such, no party could claim

- 22 -

title **to the right-of-way property** by adverse possession. *Id.* at 813. Our Supreme Court reasoned, however, that the same was not true of **additional property** the railroad owned outside of, or adjacent to, the right-of-way property because the additional property was not "impressed with a public use" and did not acquire the same protections against, *inter alia*, claims of adverse possession. *Id.* Because the additional property was not part of the railroad's right-of-way property, our Supreme Court held that the Tobyhanna Company was able to assert title to the additional property under a claim of adverse possession. *Id.* at 813-814.

In the case *sub judice*, neither party presented evidence, nor did the trial court find, that a portion of the Mounts' building was located on property that BM&N acquired separately from, and adjacent to, its railroad right-of-way property. Instead, the issue before the trial court was a determination of the location of the boundary line of BM&N's right-of-way property where it abuts the Mounts' property. *See* Trial Court Order, 3/3/23. If the Mounts' building is located within BM&N's railroad property, then the doctrine of laches cannot be asserted as a defense against BM&N's action for ejectment. *See PA Energy*, 120 A.3d at 1014-1015; *see also Williamstown Borough*, 591 A.2d at 715; *A.D. Graham*, 33 A.2d at 30-31.

### Right-of-Way

Turning now to the trial court's determination regarding the location of the boundary line of BM&N's railroad property, I begin with an observation by our Supreme Court from 1898:

At that early day in railroad building, when land was far less valuable than now, [] little care was taken by either [property] owners or railroad corporations in defining with accuracy the limits of the [property lines].

***Zahn v. Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co.***, 39 A. 24 (Pa. 1898). For the reasons I explain *infra*, I find that the trial court erred in determining that the boundary line of BM&N's railroad property extended easterly 12½ feet from the center line of the railroad tracks because this determination is devoid of competent evidence to support such a conclusion.

BM&N asserts that "the trial court erred and disregarded the only competent evidence of record [in determining] that [the] boundary line [was] substantially less than the clearly identified boundary [line] in the professional land survey" provided by BM&N's expert, Michael Bercek ("Mr. Bercek"). Appellant's Brief at 33. BM&N contends that "[p]rofessional land surveys are competent evidence for determining boundaries of adjoining properties" and that the land survey created by its expert was "based upon Mr. Bercek's expertise, utilizing public records, such as courthouse research, the deeds of other properties, railroad [e]valuation maps[,] and the deed language [contained in] the deeds themselves." *Id.* at 35-36. BM&N further asserts that the Mounts did not present a land survey or similar exhibit in support of their position. *Id.* at 36. Instead, the Mounts, according to BM&N, presented Luzerne County tax assessment documents that showed the northern and southern boundary lines of the Mounts' property extending westerly for 66 feet from Main Street to the railroad property. *Id.* at 38-39. BM&N contends

that the tax assessment records were "unreliable and inaccurate, as [the records] create a parcel which passes over and through [BM&N's] right-of-way[.]"[13]   *Id.* at 39.   BM&N argues that "the trial court then determined, contrary to the professional land survey presented by [BM&N], and unsupported by any competent evidence [submitted by] the Mounts, that the right[-]of[-]way measuring 12½ feet from the centerline of [BM&N's] railroad track was appropriate as the western boundary line of [the Mounts'] property." *Id.* at 37.

In determining that the easterly boundary line of BM&N's railroad property was 12½ feet from the center of its railroad tracks, the trial court explained,

> In both trials, [BM&N] has taken the position that [the language] "to the Lehigh Valley Railroad" [contained in the Mounts' property deeds] means to the edge of the property owned by [BM&N] since the Lehigh Valley Railroad was one of its predecessors[-]in[-]title. At the first trial, [BM&N] produced a "survey plan" [(Plaintiff's Exhibit P-1)] prepared by its expert land surveyor, Mr. Bercek, purporting to identify the property [belonging to BM&N].   Mr. Bercek explained that he prepared the plan for [BM&N] using various pieces of information from his research of the deeds of railroads in the chain of title, the deeds for the surrounding lots, monuments in the field, and evaluation (also referred to sometimes as "valuation") maps.   He explained that the

_____

[13] In the second trial, the trial court agreed that its reliance on the tax assessment records to determine that the Mounts' northern and southern boundary lines extended westerly for 66 feet from Main Street to the railroad property was erroneous.  Trial Court Opinion, 3/8/24, at 10-11 (stating, "it was never the [trial court's] intention that [the Mounts'] property lines would cross over and encompass a portion of BM&N's railroad tracks." *Id.*  It was for this reason, that the trial court granted BM&N a new trial.

evaluation maps were prepared by the railroad [company] and kept on file with the railroad [company] and with the Pennsylvania Historical Commission. Mr. Bercek identified an evaluation map [(Plaintiff's Exhibit P-2)] that was attached to [BM&N's] recorded deed [(Plaintiff's Exhibit P-3)] and testified that it was the evaluation map for the area in question. He testified that the maps were typically [prepared] for the railroad [companies] and their contractors. Mr. Bercek appeared to give great weight to the evaluation maps in preparing his "survey plan." Notably, however, the evaluation map is referenced nowhere in [the Mounts'] chain of title and most likely would not have been available in the 1870s, other than in the files of the railroad [company].

On cross-examination by [the Mounts'] counsel, Mr. Bercek confirmed that he did not place any distance measurements on [the survey plan] showing the distance in feet, or otherwise, along [the Mounts'] property from Main Street to the area that he depicted as that of [BM&N's railroad property]. He testified that he took those measurements, but he did not place them on the [survey] plan or have them in court with him that day, and he could not state what the distance was. He admitted that in his years of experience as a surveyor, he would not typically create a legal description that did not include a specific footage for the boundary lines between properties.

Also, while still on cross-examination, [the Mounts'] counsel provided Mr. Bercek with a copy of the records from the Luzerne County Tax Assessment Office relating to [the Mounts'] property [(Defendant's Exhibit D-90)]. Mr. Bercek confirmed that he would have reviewed the documents as part of his research in preparing the survey plan. During cross-examination, redirect examination, and recross examination, he also confirmed that [the tax assessment office documents] depicted [the Mounts'] parcel[s] as having [an aggregate] width [abutting] Main Street of 99 feet and a depth of 66 feet on its northerly and southerly boundaries as they extend to the line of the railroad. He agreed with defense counsel that a depth of 66 feet would take the [Mounts'] property line back beyond the depth of their building. He also indicated, however, that he would not have given the tax records much weight in determining [] the property lines[.] Interestingly, the tax assessment records are something that a title searcher would typically have access to and perhaps the only document available in the records of Luzerne County that shows a measured depth of [the Mounts'] property.

. . .

At the re-trial, [BM&N] again presented Mr. Bercek as its land surveyor expert. Mr. Bercek was questioned by [BM&N's] counsel with respect [to] Plaintiff's Exhibit P-9, which was another survey plan that Mr. Bercek prepared after the [trial] court's August 31, 2022 [verdict.] Despite the questioning from [the Mounts'] counsel in the first trial, Mr. Bercek again placed no measurements on the northerly and southerly lines of [the Mounts'] property as it extends westerly from Main Street. In addition, [BM&N] made no effort to distinguish what portion of the lands that it was claiming as its own were necessary for its use as a right-of-way for its railroad operations. Instead, [BM&N] simply presented essentially the same [survey] map as it did in the first trial with no regard for the limitation the [trial] court stated in its March 3, 2023 order granting a new trial.

By way of cross-examination of Mr. Bercek, [the Mounts'] counsel did attempt to establish some distances between points by "marking-up" Plaintiff's Exhibit [P-]10 (*see* [Defendant's Exhibit D-98]). In addition, [the Mounts'] counsel called [Mr.] Mount, and through his testimony, had [Defendant's Exhibit D-93] admitted[,] which was simply another "marked-up" version of [Plaintiff's Exhibit P-10] that Mr. Mount [] created himself in an attempt to depict where a line measured 10 feet from the easterly rail of [BM&N's railroad] tracks would fall on the [survey] map.

At the conclusion of the testimony at the May [3], 2023 re-trial, the [trial] court kept the record open in order for the [trial] court to conduct a view[ing] of the property. The [trial] court conducted the view[ing] on August 25, 2023. At the view[ing], Mr. Mount demonstrated, without objection, how he [] measured 10 feet from [BM&N's] easterly railroad track, using a 10-foot piece of [one-]inch PVC pipe, to create the line he drew on [Defendant's Exhibit D-93]. The [trial] court observed that in each position that he measured, 10 feet was beyond the large stones or sub-ballast that forms the base of the railroad bed. In addition, the [trial] court observed that several of the properties to the north of [the Mounts'] property appear to have property lines even closer to the railroad tracks than the [Mounts'] building[.]

Once again, as after the first trial, the [trial] court was left with no exhibit or map from either party showing a definitive measurement for the northerly and southerly boundary lines of [the Mounts'] property. It was clear from an observation of the

- 27 -

railroad tracks in relation to [the Mounts'] building and land, and in relation to the properties to the north of [the Mounts'] property on the easterly side of [BM&N's railroad] tracks, that the land claimed by [BM&N] where it adjoins [the Mounts'] property was far in excess of that which is needed and has been used by [BM&N] (and [its] predecessors[-]in[-]title) for the operation of its railroad for 120 years or more. [BM&N] presented no evidence (and the [trial] court observed none) that would lead the [trial] court to conclude that [BM&N] required any more land for the operation of its railroad than that extending to the edge of the sub-ballast.

Based upon the [trial] court's observation during the view[ing] of the property and Plaintiff's Exhibit [P-9], the distance between the rails of [BM&N's railroad] track appears to be approximately five [] feet, and the distance from the outside of the easterly rail to the edge of the sub-ballast appears to be approximately 10 feet. Accordingly, the [trial] court established, for purposes of this litigation only, a right-of-way measured [12½] feet from the centerline of [BM&N's] railroad track as the westerly boundary of [the Mounts'] property.

Trial Court Opinion, 3/8/24, at 8-13 (extraneous capitalization and some record citations omitted).

In affirming the trial court's determination as to the location of the property line between the Mount's property and the BM&N's railroad property, the Majority narrowly construes the reference in the Mount's deed – "extending thence westward to the Lehigh Valley Railroad" – as meaning that the Mount's property extended westward from Main Street "to the immovable physical landmark **of the railroad tracks**." Majority at *13 (emphasis added). I cannot agree with this narrow, dictionary-driven definition of the term "railroad" within the context of a deed when determining a property line dispute and, especially, in light of our long history of caselaw governing railroads. As caselaw and legislative acts establish, railroads were

- 28 -

given broad and expansive powers to "survey, ascertain, locate, fix, mark, and determine the quantity" of land to be used for its operations. *See Zahn*, 39 A. at 24.

It has long-been held that "[a] railroad right[-]of[-]way is not confined to the portion of the ground occupied by its tracks." *Lacy v. Montgomery*, 124 A.2d 492, 497 (Pa. Super. 1956); *see also St. Louis, Kansas City, & Colorado R.R. Co. v. Wabash R.R. Co.*, 30 S.Ct. 510, 513 (1910) (stating that, a railroad right-of-way is not limited to its main tracks); *Lehigh Valley Rail Mgmt. LLC v. Cnty. of Northampton Revenue Appeals Bd.*, 178 A.3d 950, 958 (Pa. Commw. 2018) (stating, a "railroad 'right-of-way' is broader in scope than a pair of steel railroad tracks[;]" the "dimensions of a railroad right-of-way vary"). For example, the federal General Railroad Right-of-Way Act of 1875 (18 Stat. 482, 43 U.S.C.A. §§ 934-939) permitted a railroad right-of-way to be "to the extent of one hundred feet on each side of the central line of said road." *Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93, 98 (2014), *quoting* 43 U.S.C.A. § 934. Similarly, the Pennsylvania Railroad Act of February 19, 1849 (P.L. 79, *as amended*, 67 P.S. § 271) provided that a railroad company could acquire a right-of-way "not [to] exceed 60 feet in width except in the neighborhood of deep cuttings or high embankments or places selected for sidings, turnouts, depots, [and] engine or water stations." *Lacy*, 124 A.2d at 497; *see also Rodgers v. Pittsburgh, Fort Wayne & Chicago R.R. Co.*, 100 A. 271 (Pa. 1917) (stating that, by its charter, the railroad company was "authorized to enter upon any land and

appropriate as much thereof as might be deemed necessary for its corporate purposes"); *Zahn*, 39 A. at 24 (stating that, the Pennsylvania Railroad Act of February 19, 1849 provided railroads a right to appropriate land "not to exceed 60 feet in width, except where it might take more at deep cuttings, high embankments, or places selected for sidings, turn-outs, depots, [and] engine or water stations"). As was permitted under the Pennsylvania Railroad Act of February 19, 1849, it was for a railroad's board of directors, "in the exercise of their honest judgment," to determine what property was necessary for the railroad's right-of-way, considering both its present needs and its future needs. *Rodgers*, 100 A. at 271; *see also Zahn*, 30 A. at 24. "Where a right[-]of[-]way is granted up to a specified maximum width, the presumption is that the grantee of the right took the maximum width." *Arnovits v. Commonwealth*, 19 A.2d 287, 287-288 (Pa. 1941); *see also Zahn*, 39 A. at 25 (stating that, the party opposing the railroad's claim of property bears the burden of establishing that the railroad took less property than what was permitted by legislative act; the presumption is the railroad took the maximum property allowable under the legislative act).

As our Supreme Court in *Obert*, *supra*, long-ago noted, "[t]o establish the true location of a railroad [right-of-way] in Pennsylvania is a matter peculiarly within the power of the railroad company." *Obert*, 1 A. at 401. The *Obert* Court further noted that "[t]here is not, and never has been, any requirement that the location should be anywhere filed or recorded for the benefit of parties interested. The papers indicating the lines are the property

- 30 -

of the [railroad] company, and are ordinarily inaccessible to persons having no connection with the company[.]" *Id.* The quantity of land that a railroad maintains for its operations is not determined by viewers of the property but, rather, by surveys and plans maintained by the railroad company. *Zahn*, 39 A. at 25.

The record reveals that, at both the August 24, 2022 trial and the May 3, 2023 trial, Mr. Bercek was admitted as an expert in land surveying.[14] N.T., 5/3/23, at 7; *see also* N.T. 8/24/22, at 8. At the August 24, 2022 trial, Mr. Bercek testified that he determined the easterly boundary line of BM&N's railroad property, as depicted in Plaintiff's Exhibit P-1 (as well as the Diagram, *supra*), by first obtaining copies of "the deeds for not only the railroad [company] itself but all of the adjoining properties" from the Recorder of Deeds Office for Luzerne County. N.T., 8/24/22, at 9-10. Mr. Bercek stated that he then took those deeds into the field and searched the properties for monuments, including "iron pins, concrete monuments, and things of that nature[.]" *Id.* at 10. Mr. Bercek also consulted evaluation maps, which, as he explained, were prepared by railroad companies from time to time and showed information from earlier surveys done by the railroad companies and their contractors. *Id.* at 10-11.

---

[14] At the May 3, 2023 trial, the trial court, upon request of both parties, took judicial notice of the August 24, 2022 trial transcript and admitted the notes of testimony into the record for consideration. Therefore, as part of my review, I examined, and refer to, the May 3, 2023 notes of testimony, as well as the August 24, 2022 notes of testimony.

At the May 3, 2023 trial, Mr. Bercek testified similarly that he determined the location of the easterly boundary line of BM&N's railroad property by reviewing various deeds, evaluation maps cited in the deeds, and monuments in the field, as well as dimensions, variances, and distances on the evaluation maps. N.T., 5/3/23, at 13. Mr. Bercek explained that the evaluation maps showed the ownership interests held by the railroad company in lands, and by using the deeds and evaluation maps referenced in the deeds, he was able to determine the boundary line of BM&N's railroad property. *Id.* at 14. Mr. Bercek said that he was also aided by physical monuments, such as iron pins and pipes that he located in the field, that were in place at the time the evaluation maps were prepared. *Id.* at 15.

Mr. Bercek explained that he measured the distance from the easterly boundary line of the Mounts' property (Main Street) as it extended westerly to BM&N's railroad property in preparing the survey map, but he did not record the depth of the Mounts' boundary northern and southern lines on his survey map nor could he recall, at trial, the distances. N.T., 8/24/22, at 27. Mr. Bercek described the Mounts' property deed as being both ambiguous and unambiguous. He explained that the deed was ambiguous in that the deed did not specifically state the length or depth of the northern and southern boundary lines of the Mounts' property, those being the boundary lines that extended from Main Street westerly to the railroad property, but was unambiguous in that it stated that the boundary lines extended from Main Street westerly to the Lehigh Valley Railroad property. *Id.* at 31, 36, 43. In

other words, the railroad property was the "monument" that determined the depth of the Mounts' northern and southern boundary lines.

Mr. Mount testified that, when he and his wife purchased the property, they did not have the property surveyed. *Id.* at 74. Mr. Mount agreed that his deed did not identify "a specific footage for the length of the property as it extends westward from Main Street towards the railroad tracks." *Id.* at 63. On cross-examination, Mr. Mount admitted that he was not a land surveyor and was not licensed to perform land surveys. *Id.* at 78. Mr. Mount explained that, because his property deed did not specifically state the depth of the property extending westerly from Main Street, he "always assumed that the railroad [property] was starting at [the] physical location [of the] stone bed and tracks." N.T., 5/3/23, at 42. To demonstrate what he believed to be the boundary line of his property as it abuts the railroad property, he marked a line approximately 10 feet from the eastern-most railroad track, which brought the boundary line to the edge of the railroad bed. *Id.* at 34. Mr. Mount understood the term "railroad bed" to mean the foundation of the railroad tracks. N.T., 8/24/22, at 79. In other words, the railroad bed was comprised of the railroad tracks, the railroad ties, and the balancing stone on which these items rested. The Majority accepted Mr. Mount's definition of a "railroad bed" to be synonymous with the term "railroad" as referred to in the Mounts' property deeds.

During a viewing of the property on August 25, 2023, Mr. Mount pointed to a line that he marked, using a piece of PVC pipe, as being 10 feet from the

eastern-most railroad track to the edge of the railroad bed, which in his view formed the boundary line between his property and BM&N's railroad property. N.T., 8/25/23, at 10-11. Mr. Bercek similarly pointed to what his survey results, which were based upon, *inter alia*, railroad evaluation maps and other tangible records, demonstrated to be the boundary line between the Mounts' property and BM&N's railroad property. ***Id.*** at 12-13. Mr. Bercek stated that the southern property line of Lot 47, starting at the curb line on Main Street, extended "approximately 30 feet" westward to the railroad property line. ***Id.*** at 8. He further stated that the northern property line of Lot 47, starting at the curb line on Main Street, extended "about 42 feet" westward to the railroad property line.[15] ***Id.*** Mr. Bercek explained that the evaluation maps he relied upon to develop the survey map, as well as the railroad property line, showed the location of the present buildings, as well as a building, which no longer existed but was previously located on Lot 51, and the railroad property. ***Id.*** at 13. A representative from the railroad company explained that the evaluation maps were "requested by the Interstate Commerce Commission in the early 1900s[,] somewhere between 1910 and 1920[,] when [] the entire railroad system was taken over by the [federal] government during World War I." ***Id.*** at 14. When the federal government took control of the nation's railway system, "a survey was done of the entire United States rail system."

---

[15] Mr. Bercek's testimony demonstrates that exact measurements pertaining to the northern and southern boundary lines of Lot 47 were clearly discernable and could have been represented on the survey map with little effort.

*Id.* Mr. Bercek stated that the evaluation maps were "very clear what the railroad owned and all the adjoining properties. [The evaluation maps] even had a breakdown of the source of title and all the tracks of land that [the railroad companies] acquired to create that property that they have to run the railroad." *Id.* at 15. Mr. Bercek stated that the evaluation maps are a matter of public record with the Pennsylvania State Archives and that someone performing a title search on a property could obtain a copy of the property deed from the county recorder of deeds, as well as a copy of the evaluation map referenced in the property deed, to fully understand the boundaries of the property. *Id.* at 14-15. Mr. Bercek further pointed out that other buildings adjacent to the Mounts' property "are actually cut off parallel to the railroad [property,]" as defined by the survey map, meaning that the structures on the other properties were constructed so as to avoid encroachment on the railroad property. *Id.* at 16.

A review of a deed dated June 13, 1838, reveals that Josiah White sold 377 acres of land, which encompassed the portions of the property lots currently owned by the Mounts, to the Lehigh Coal and Navigation Company.[16] *See* Plaintiff's Exhibit P-6. The land was then subdivided into lots to form the

---

[16] The Lehigh Coal and Navigation Company "was incorporated by the [Commonwealth] of Pennsylvania to mine [anthracite] coal, and to operate a slack[-]water navigation on the Lehigh river. It dug a canal along the river from a point south of Wilkes-Barre[, Pennsylvania,] to the Delaware river at Easton, [Pennsylvania,] and carried its coal to Easton by this canal before the [Lehigh & Susquehanna Railroad] was built." *Central R.R. Co. of New Jersey v. United States*, 229 F. 501, 503 (3rd Cir. 1915).

town of White Haven. On June 20, 1871, the Lehigh Coal and Navigation Company deeded a portion of Lots 49 and 51 to John Huegel. *Id.* The deed to John Huegel stated that the two lots were 66 feet in width parallel to Main Street (formerly Railroad Street) and were the eastward part of the lots that extended westward to the Lehigh Valley Railroad. *Id.* That same day, June 20, 1871, the Lehigh Coal and Navigation Company deeded a portion of Lot 47 to John Feil, *et al.* *Id.* The deed to John Feil, *et al.*, stated that the lot was 33 feet in width parallel to Main Street (formerly Railroad Street) and was the eastward part of the lot that extended westward to the Lehigh Valley Railroad. *Id.* Thus, the language contained in these deeds began the reference in future deeds that described the northern and southern boundary lines of the Mounts' property as extending from Main Street to the railroad property without mention of a specific depth for the northern and southern boundary lines. *See generally id.* Moreover, the language in the deeds that described the lots as the "eastward part" signified that the grantees, *i.e.*, Mr. Huegel and Mr. Feil, did not obtain ownership of the entire lot as it extended from Main Street (formerly Railroad Street) to Towanda Street (the adjacent street running parallel to Main Street in the White Haven plan of lots) but, rather, received ownership of only the "eastward part" of the lot.[17]

---

[17] At its inception, the town of White Haven was laid out in various lot formations with designated streets. The majority of the lots that ran along Main Street, formerly Railroad Street, were plotted as lots extending 200 feet from Main Street to Towanda Street. The Lehigh Valley Railroad bisected

In the case *sub judice*, the trial court, without an "exhibit or survey map from either party showing a definitive measurement for the northerly and southerly boundary lines of [the Mounts'] property," determined that the boundary line of the railroad property was located 12½ feet eastward from the center of the railroad tracks. Verdict, 9/18/23; **see also** Trial Court Opinion, 3/8/24, at 12-13. The trial court, persuaded by the Mounts' use of a PVC pipe to determine the location of the property line, based its determination on its "observations during the [viewing] of the property and Plaintiff's Exhibit P-9 [which showed] the distance between the rails of [BM&N's] track [] to be approximately [5] feet, and the distance from the outside of the easterly rail to the edge of the [railroad bed] to be approximately 10 feet."[18] Trial Court Opinion, 3/8/24, at 13. The trial court further explained that "[i]t was clear from an observation of the railroad tracks

---

many of these lots that were located along Main Street. As such, the lots were designated in many deeds as the "eastward part" or the "westward part" of the same 200-foot lot, *i.e.*, Lot 51, 49, 47, 45, and so forth, depending on which side of the railroad property the portion of the lot was located. For example, Mr. Huegel owned the eastward part of Lot 51 because his portion of Lot 51 was located to the east of the Lehigh Valley Railroad property while someone else owned the westward part of Lot 51, which lay to the west of the Lehigh Valley Railroad property.

[18] If the survey map, Plaintiff's Exhibit P-9, was sufficient to establish distances between the railroad tracks (5 feet) and the railroad track and the edge of the railroad bed (10 feet), it seems logical that the survey map would provide competent evidence establishing the distance of the Mounts' property northern and southern property lines as they extend from Main Street to BM&N's railroad property, as depicted on the survey map.

in relation to [the Mounts'] building and land, and in relation to the properties to the north of [the Mounts'] property on the easterly side of [BM&N's railroad] tracks, that the land claimed by [BM&N] where it adjoins [the Mounts'] property was **far in excess of that which is needed and has been used by [BM&N] for the operation of the railroad for 120 years or more**." **Id.** (emphasis added).

I begin my review by examining the legal principals underlying actions for ejectment (BM&N's cause of action) and to quiet title (the Mounts' cause of action). "Ejectment is an action filed by a plaintiff who does not possess the land but has a right to possess it, against a defendant who has actual possession. Ejectment is a possessory action only, and can succeed only if the plaintiff is out of possession, and the plaintiff has a present right to immediate possession." **Becker v. Wishard**, 202 A.3d 718, 721 (Pa. Super. 2019) (citations, brackets, and original quotation marks omitted). "Therefore, to prevail in an ejectment action, the plaintiff must show title at the commencement of the action and can recover, if at all, only on the strength of [its] own title, not because of weakness or deficiency of title in the defendant." **Id.** at 722 (citation and original quotation marks omitted). "An action to quiet title is designed to resolve a dispute over the title to real estate of which the plaintiff is in possession. The plaintiff bringing a quiet title action has the burden of proof and must recover on the strength of its own title." **Woodhouse Hunting Club, Inc. v. Hoyt**, 183 A.3d 453, 457 (Pa. Super. 2018) (citations omitted). "Concerning the difference between an action to

quiet title and an action of ejectment, [an action to] quiet title serves to determine the relative and respective rights of all potential title holders. The purpose of an ejectment action as opposed to quiet title is not to determine the relative and respective rights of all potential title holders, but rather the immediate rights between plaintiff and defendant involved in that particular litigation." ***Stoley v. Wampler***, 317 A.3d 1007, 1016 n.5 (Pa. Super. 2024). Therefore, in the case *sub judice*, in order for BM&N and the Mounts to prevail on their respective causes of action, an action for ejectment and an action to quiet title, **each bears the burden of establishing the right to possession based upon the strength of their respective titles**. To resolve their respective causes of action, each party needed to establish the location of the boundary line between the Mounts' property and BM&N's railroad property **by competent evidence of record**.

It is undisputed that BM&N's railroad property is used for the operation of an active railroad. The Mounts offered no evidence, other than Mr. Mounts' opinion, that the boundary line between his property and BM&N's railroad property was located at the edge of the railroad bed. N.T., 5/3/23, at 42 (stating, Mr. Mount "always assumed that the railroad [right-of-way] was starting at [the] physical location [of the] stone bed and tracks"); ***see also*** Trial Court Opinion, 3/8/24, at 12 (stating that, at trial, the Mounts admitted an exhibit that "was simply another 'marked up' version of [BM&N's survey map] that Mr. Mount created himself in an attempt to depict where a line measured 10 feet from the easterly rail of [BM&N's railroad] tracks would fall

on a map"). On the other hand, BM&N offered evidence in the form of deeds, evaluation maps, and a survey map prepared by an expert in land surveying that depicted the boundary line of the railroad property as existing beyond the railroad bed. *See* Plaintiff's Exhibits P-1 to P-6, P-9, P-10. Mr. Bercek testified that the survey map, which showed the railroad property extending beyond the railroad bed, was based upon his review of pertinent deeds and evaluation maps, as well as the location of monuments in the field, a process regularly used by land surveyors to determine the locations of boundary lines. N.T., 5/3/23, at 14-15. On the survey map, as depicted *supra*, Mr. Bercek indicated that BM&N's railroad property boundary line was located 42 feet eastward from the eastern-most track of BM&N's railroad line toward the eastward part of Lot 51 along Allegheny Street and 23.6 feet eastward from the eastern-most track of BM&N's railroad line toward the eastward part of Lot 43. *See* Plaintiff's Exhibit P-9; *see also* Diagram, *supra*. At trial, however, Mr. Bercek did not explain **in detail** what information, *i.e.*, what monuments, deeds and references therein, and other relevant tools relied upon by an expert land surveyor, he relied upon to determine the location of the boundary line.[19] As such, the trial court declined to rely on Mr. Bercek's survey map showing the location of the boundary line of the railroad property because Mr.

---

[19] For example, while Mr. Bercek was able to determine the distance of BM&N's railroad property boundary line from the eastern-most railroad track as it relates to the eastward parts of Lots 43 and 51, the survey map does not contain a similar distance as it relates to the eastward part of Lot 47, which was the primary concern in the litigation.

Bercek "placed no measurements on the northerly and southerly lines of [the Mounts'] property as it extends westerly from Main Street."[20]  **See** Trial Court Opinion, 3/8/24, at 11.  Mr. Bercek explained, however, that at the time he conducted his survey of the railroad property, including the portion of the railroad property that abutted the Mounts' property, he was contracted to survey the railroad property as it "stretch[ed] through the borough" of White Haven and his survey work was not restricted solely to a survey of the railroad property as it related to the Mounts' property.  N.T., 8/24/22, at 27.  In other words, one of the reasons that Mr. Bercek did not include every measurement on his survey map as it related to the Mounts' property was because the scope of the survey project was much broader than the relationship between BM&N's railroad property and the Mounts' property.  **See id.** at 28 (stating, "just to clarify, I do have the exact dimensions from Main Street to the railroad [property.]  We did measure that.  [I]t's just not noted on the plan.").  Mr. Bercek further explained that he researched the deeds for the other property lots within the area of the Mounts' property.  Some deeds reviewed by Mr. Bercek contained exact depth measurements for the northern and southern boundary lines of the properties as those lines extended from Main Street to

---

[20] I find no basis to forgo consideration of the survey map prepared by an expert land surveyor as competent evidence of the location of the railroad property due to the lack of measurements.  The trial court, in reaching its conclusion as to the location of the boundary line, relied upon the same survey map to decern the distance between the railroad tracks (5 feet) and the distance between the eastern-most railroad track and the edge of the railroad bed (10 feet).

the Lehigh Valley Railroad while other deeds, such as the deeds pertaining to the Mounts' properties, did not contain exact measurements but, rather, simply stated that the northern and southern boundary lines extended westward from Main Street to the Lehigh Valley Railroad. For example, the deed for the eastward part of Lot 41 states that the southern boundary line of the property extends from Main Street westward 91 feet to the Lehigh Valley Railroad. *See* Luzerne County Record Of Deeds, Book 149, Page 466.

The Majority, in affirming the trial court's determination, is concerned that the boundary line, as determined by Mr. Bercek, was not drawn in a straight line so that it affected the Mounts' property, as well as the neighboring properties, in the same manner. *See* Majority at *19. In other words the railroad's property line, according to the Majority, should have been set back equal distance from Main Street at all points. *See* Majority at *4 (stating, "despite the right-of-way not being a uniform width between the tracks and the neighboring properties as it ran north to south, [Mr. Bercek's] survey only included measurements for two widths: one at the southern boundary of the Mounts' property, and the other at a point between two of the northern neighbors' properties. Notably, the measurements were set at different angles[.]"); *see also* Majority at *19 (stating, BM&N's "proposed boundary line drastically deviated from those of the northerly properties"). The notion that a railroad's property boundary lines run in straight lines north to south or east to west and are equal distance apart (meaning that the railroad property has a consistent width) simply is not a reality based upon the historical

- 42 -

formation of the railroad industry. As seen by both federal and state acts, the width of railroad property varied, *i.e.*, 60 feet wide or 100 feet wide, and could, in some instances, be as wide as the railroad board of directors determined was necessary for the operations of the railroad. The location and path of a railroad's property followed the terrain and other barriers, such as rivers, as depicted by the path of the Lehigh Valley Railroad in Plaintiff's Exhibit P-2. ***See*** N.T., 8/24/22, at 12 (explaining that, the dark lines on Plaintiff's Exhibit P-2 represent the path of the Lehigh Valley Railroad property and the railroad property narrows and widens in width as the railroad property progressed through the White Haven Community). It logically follows that the boundary lines of a railroad's property would not conform to straight lines running north to south or east to west as it transects different lots and parcels of private property along its path. Rather, the boundary lines of the railroad property were laid out at various angles and dimensions based upon the obstacles and barriers in its path and the needs of the railroad company. As such, a railroad's property line may transect a property lot at an angle running south-east to north-west. I found this to be true, for example, in the dimensions of Lot 53, which is the lot located on the opposite side of Allegheny Street from the Mount's Lot 51. The historical deed for the eastward part of Lot 53 shows that the northern property line extends 19 feet and 4 inches from Main Street westward to the Lehigh Valley Railroad but the southern property line extends only 9 feet and 4 inches from Main Street westward the Lehigh Valley Railroad. Thus, the Lehigh Valley Railroad's property ran at an

angle across the eastward part of Lot 53. **See** Luzerne County Recorder of Deeds, Book 252, Page 380.

I would concur with the trial court, and the record supports, that neither party presented evidence "showing **a definitive measurement** for the northerly and southerly boundary lines of [the Mounts'] property."[21] **Id.** at 12 (emphasis added). I cannot, however, concur with the trial court's determination, in the absence of competent evidence, that the eastern boundary line of the railroad property is located 12½ feet from the center of the railroad tracks.

As caselaw and legislative acts have shown, the property acquired by railroads **extended far beyond the railroad bed**. **See Lacy**, 124 A.2d at 497; **see also St. Louis, Kansas City, & Colorado R.R. Co.**, 30 S.Ct. at 513; **Lehigh Valley Rail Mgmt.**, 178 A.3d at 958; **Marvin M. Brandt Revocable Trust**, 572 U.S. at 98; **Rodgers**, 100 A. at 271; General Railroad Right-of-Way Act of 1875 (18 Stat. 482, 43 U.S.C.A. §§ 934-939); Pennsylvania Railroad Act of February 19, 1849 (P.L. 79, *as amended*, 67 P.S. § 271). Moreover, from the moment that a railroad company acquires its

---

[21] For over a century, deeds conveying Lots 47, 49, and 51 have used the description "westward to the Lehigh Valley Railroad" to determine the depth of the Mounts' property. As such, the imperative determination is not the exact measurement of the northern and southern boundary lines of the Mounts' property but, rather, a determination of the location of the railroad property. Once the location of the railroad property is determined, then a measurement of the depth of the Mounts' northern and southern boundary lines can be ascertained.

property, that property becomes a "public highway" for the benefit of the Commonwealth and receives certain protections against, *inter alia*, adverse protection and the doctrine of laches, so long as the property remains an active railroad. **See PA Energy**, 120 A.3d at 1014; **see also Conwell**, 88 A. at 418; **A.D. Graham**, 33 A.2d at 28.

In reaching its conclusion that the boundary line of BM&N's railroad property extended only to the edge of the railroad bed, the trial court, without competent evidence and support in the record for its decision, used equitable powers to determine, based upon its own observations, that the expanse of property existing 12½ feet both eastward and westward from the centerline of the railroad tracks was all the property BM&N needed to operate its railroad for over 120 years. Trial Court Opinion, 3/8/24, at 12-13. Simply put, equity cannot be utilized to resolve disputes over legal title to land. **PA Energy**, 120 A.3d at 1017. Rather, the parties were required to establish their title, respectively, to the property through competent evidence. Therefore, upon extensive research and careful consideration, I would vacate the January 3, 2024 judgment, as well as and the September 18, 2023 verdict, and remand the case for a third trial.[22]

_____

[22] I would remind the parties, as the trial court did in granting Appellant a second trial, that they must provide the trial court with competent evidence establishing their respective rights to title of the property in order to satisfy their respective burdens under the causes of action for ejectment and to quiet title. The evidence should encompass more than a survey map that lacks measurements of the relevant boundary lines, as well as opinions depicted

It is for these reasons that I respectfully dissent.

_____

through use of PVC pipe.  Detailed testimony as to the historical records and monuments relied upon to reach the definitive conclusions depicted in a survey map is required.